Jeffrey Lewis (SBN 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 64612
(510) 463-3900, Fax (510) 463-3901
jlewis@kellerrohrback.com

Lynn Lincoln Sarko, *pro hac vice forthcoming*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900, Fax (206) 623-3384
lsarko@kellerrohrback.com

Lesley E. Weaver (SBN 191305)
BLEICHMAR FONTI & AULD, LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
(415) 445-4003, Fax (415) 445-4020
lweaver@bfalaw.com

J. Gerard Stranch IV, *pro hac vice forthcoming*
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801, Fax (615) 250-3937
gerards@bsjfirm.com

Benjamin L. Bailey, *pro hac vice forthcoming*
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555, Fax (304) 342-1110
bbailey@baileyglasser.com

Joseph F. Rice, *pro hac vice forthcoming*
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000, Fax (843) 216-9450
jrice@motleyrice.com

Elizabeth Cabraser (SBN 083151)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000, Fax (415) 956-1008
ecabraser@lchb.com

David S. Stellings, *pro hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500, Fax (212) 355-9592
dstellings@lchb.com

***Attorneys for Plaintiffs***
***\*Additional Counsel Listed on Signature Page***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| MATHUE FASCHING, THOMAS MCGANN, JR., JOSEPH NEUPERT, BRYAN MUCKENFUSS, SATYANAM SINGH, JOHN RADZIEWICZ, and BINH QUOC TRAN, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiffs,<br><br>         v.<br><br>FCA US LLC; and FIAT CHRYSLER AUTOMOBILES N.V.,<br><br>                                        Defendants. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    NATURE OF THE ACTION ................................................................................1

III.   INTRADISTRICT ASSIGNMENT ......................................................................3

IV.    PARTIES ..............................................................................................................4

       A.    Plaintiffs .....................................................................................................4

       B.    Defendants ..................................................................................................4

V.     PLAINTIFFS' FACTS .........................................................................................6

VI.    JURISDICTION AND VENUE ...........................................................................9

VII.   FACTS COMMON TO ALL COUNTS .............................................................10

       A.    The Defeat Device Scheme ......................................................................10

       B.    Applicable Emissions Standards & Testing .............................................15

       C.    Defendants Marketed the Class Vehicles as Environmentally Friendly,
             Emissions-Compliant, and Fuel-Efficient ...............................................17

VIII.  CLASS ACTION ALLEGATIONS ....................................................................20

             1.    Numerosity: Federal Rule of Civil Procedure 23(a)(1) ...................21

             2.    Commonality and Predominance: Federal Rule of Civil Procedure
                   23(a)(2) and 23(b)(3) .....................................................................22

             3.    Typicality: Federal Rule of Civil Procedure 23(a)(3)....................23

             4.    Adequacy: Federal Rule of Civil Procedure 23(a)(4) ....................23

             5.    Declaratory and Injunctive Relief: Federal Rule of Civil Procedure
                   23(b)(2) ..........................................................................................23

             6.    Superiority: Federal Rule of Civil Procedure 23(b)(3) ..................24

IX.    ANY APPLICABLE STATUES OF LIMITATION ARE TOLLED .....................24

       A.    Tolling Due To Fraudulent Concealment .................................................25

       B.    Estoppel ....................................................................................................25

X.    CAUSES OF ACTION ....................................................................................................26

    A.    Claims Asserted on Behalf of the Entire Class ....................................................26

        COUNT I RACKETEER INFLUENCED AND CORRUPT
        ORGANIZATIONS ACT ("RICO") Violation of 18 U.S.C. §
        1962(c)-(d) ...........................................................................................................26

            a.    Description of the Defeat Device RICO Enterprise ..................................27

                (i)    The Fiat-Chrysler Entity Defendants ...........................................29

                (ii)    VM Motori ....................................................................................30

            b.    The Defeat Device RICO Enterprise Sought to Increase
                Defendants' Profits and Revenues ............................................................31

            c.    Mail and Wire Fraud ................................................................................34

        COUNT II FRAUD BY CONCEALMENT (Common Law) ...........................................40

        COUNT III BREACH OF CONTRACT ...............................................................................44

        COUNT IV IMPLIED AND WRITTEN WARRANTY Magnuson - Moss
        Warranty Act (15 U.S.C. §§ 2301, *et seq.*) ....................................................45

        COUNT V UNJUST ENRICHMENT ...................................................................................47

        COUNT VI VIOLATIONS OF THE DELAWARE CONSUMER
        FRAUD ACT (6 Del. Code § 2513, *et seq.*) ....................................................47

        COUNT VII BREACH OF THE IMPLIED WARRANTY OF
        MERCHANTABILITY (6 Del. Code §§ 2-314 and 2A-212) ...........................51

        COUNT VIII BREACH OF EXPRESS WARRANTY (6 Del. Code §§ 2-
        313 and 2A-210) ...................................................................................................52

    B.    State-Specific Claims ..........................................................................................55

        COUNT IX VIOLATIONS OF THE IDAHO CONSUMER
        PROTECTION ACT (Idaho Code § 48-601, *et seq.*) ....................................55

        COUNT X BREACH OF EXPRESS WARRANTY (Idaho Code §§ 28-2-
        313 and 28-12-210) ..............................................................................................59

        COUNT XI BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (Idaho Code §§ 28-2-314 and 28-12-212) ....................61

COUNT XII VIOLATIONS OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW (La. Rev.
Stat. § 51:1401, *et seq.*)........................................................................62

COUNT XIII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY/ WARRANTY AGAINST
REDHIBITORY DEFECTS (La. Civ. Code Art. 2520, 2524)..............66

COUNT XIV VIOLATION OF NEW YORK GENERAL BUSINESS
LAW § 349 (N.Y. Gen. Bus. Law § 349) ............................................66

COUNT XV VIOLATIONS OF NEW YORK GENERAL BUSINESS
LAW § 350 (N.Y. Gen. Bus. Law § 350) ............................................69

COUNT XVI BREACH OF EXPRESS WARRANTY (N.Y. U.C.C. Law
§§ 2-313 and 2A-210) ..........................................................................71

COUNT XVII BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314 and 2A-212) ......72

COUNT XVIII FRAUDULENT CONCEALMENT (BASED ON NEW
YORK COMMON LAW) ....................................................................73

COUNT XIX VIOLATIONS OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*) ...................78

COUNT XX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Or. Rev. Stat. § 72.3140 and 72A.2120)......82

COUNT XXI BREACH OF EXPRESS WARRANTY (Or. Rev. Stat.
§§ 72.3130 and 72A.2100)...................................................................83

COUNT XXII VIOLATIONS OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT (S.C. Code Ann. § 39-5-10, *et seq.*)......84

COUNT XXIII VIOLATIONS OF THE SOUTH CAROLINA
REGULATION OF MANUFACTURERS, DISTRIBUTORS,
AND DEALERS ACT (S.C. Code Ann. § 56-15-10, *et seq.*) .............88

COUNT XXIV BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (S.C. Code §§ 36-2-314 and 36-2A-212) ......90

COUNT XXV BREACH OF EXPRESS WARRANTY (S.C. Code §§ 36-
2-313 and 36-2A-210)..........................................................................91

COUNT XXVI VIOLATIONS OF THE CONSUMER LEGAL
REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*)...........................92

COUNT XXVII VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*) ....97

COUNT XXVIII VIOLATIONS OF CALIFORNIA FALSE
ADVERTISING LAW (Cal. Bus. & Prof. Code §§ 17500, *et seq.*) ....................98

COUNT XXIX BREACH OF EXPRESS WARRANTY (Cal. Com. Code
§§ 2313 and 10210) ...................................................................................100

COUNT XXX BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Cal. Com. Code §§ 2314 and 10212).........................101

COUNT XXXI VIOLATIONS OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF EXPRESS
WARRANTIES (Cal. Civ. Code §§ 1791.2 & 1793.2(d)) .................................102

COUNT XXXII VIOLATIONS OF SONG-BEVERLY CONSUMER
WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY
OF MERCHANTABILITY (Cal. Civ. Code §§ 1791.1 and 1792)....................105

COUNT XXXIII BREACH OF EXPRESS CALIFORNIA EMISSIONS
WARRANTIES (Cal. Civ. Code §§ 1793.2, *et seq.*)...........................................107

COUNT XXXIV FAILURE TO RECALL/RETROFIT ...............................................108

COUNT XXXV VIOLATIONS OF THE CONSUMER CREDIT AND
PROTECTION ACT (W. Va. Code § 46A-1-101, *et seq.*) ...............................109

COUNT XXXVI BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (W. Va. Code §§ 46-2-314 and 46-2A-
212) .............................................................................................................113

COUNT XXXVII BREACH OF EXPRESS WARRANTY (W. Va. Code
§§ 46-2-313 and 46-2A-210) .........................................................................114

COUNT XXXVIII BREACH OF NEW MOTOR VEHICLE
WARRANTY (WEST VIRGINIA "LEMON LAW") (W. Va.
Code §§ 46A-6A-1, et seq.) ...........................................................................115

XI.    REQUEST FOR RELIEF .................................................................................118

XII.   DEMAND FOR JURY TRIAL .........................................................................119

# I.    INTRODUCTION

Plaintiffs Mathue Fasching, Thomas McGann, Jr., Joseph Neupert, Bryan Muckenfuss, Satyanam Singh, John Radziewicz, and Binh Quoc Tran, individually and on behalf of all others similarly situated ("the Class"), allege the following against auto manufacturer/distributor FCA US LLC and its corporate parent Fiat Chrysler Automobiles N.V. (together, "Fiat Chrysler" or "Defendants"); based where applicable on personal knowledge, information and belief, and the investigation of counsel. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

# II.    NATURE OF THE ACTION

1.    This action relates to the Fiat Chrysler's promotion and sale of EcoDiesel® branded diesel-powered light trucks and SUVs. These vehicles are and were advertised as offering efficient fuel economy, desirable performance, and clean, environmentally friendly emissions. In reality, these vehicles, like the well-known Volkswagen diesel vehicles, were equipped with a software algorithm—a "defeat device"—designed to cheat federal and state emission testing for oxides of nitrogen, and thereby deceiving the Environmental Protection Agency ("EPA") and other regulators into approving for sale hundreds of thousands of non-compliant vehicles.

2.    The defeat device consists of software installed on engine management systems that detect when the vehicle is undergoing emissions testing versus driving on the road, and adjust the functioning of the vehicles' sophisticated emissions controls to ensure that they would pass emissions testing. At other times *except* when undergoing emission testing, these vehicles emit vastly more harmful pollutants than federal and state law allow.

3.    Fiat Chrysler promises low-emission, environmentally friendly vehicles with efficient fuel economy and strong performance. Consumers believed these representations and bought and leased over 100,000 EcoDiesel® vehicles. All the while, these consumers are unwittingly among the highest

polluters on the road, despite having paid a premium for purportedly clean vehicles. The manufacturer's warranties, advertising, and other statements about the vehicles' legal compliance, cleanliness, and environmental friendliness are patently false and misleading.

4.      On January 12, 2017, the EPA acknowledged Defendants' deceit and issued a Notice of Violation to Defendants for violations of the Clean Air Act, 42 U.S.C. §§ 7401-7671q, and it's implementing regulations.

5.      Also on January 12, 2017, the California Air Resources Board (CARB) issued a Notice of Violation to Defendants after detecting "auxiliary emissions control devices" in EcoDiesel® vehicles. The CARB announcement noted that the Defendants failed to disclose these devices, which "significantly increase" NOx emissions when activated.

6.      Plaintiffs and Class members are individuals and businesses who purchased or leased a Class Vehicle in the United States. The Class Vehicles include the 2014–2016 Ram 1500 pickup truck and the 2014–2016 Jeep Grand Cherokee SUV when equipped with Fiat Chrysler's 3.0-liter EcoDiesel® engine.

7.      Defendants induced Plaintiffs and Class members to purchase or lease the Class Vehicles, which violate the Clean Air Act (among other laws) and, on top of that, do not perform as represented. Class members would not have purchased or leased the Class Vehicles had they known the truth of Defendants' fraudulent scheme. In fact, no American would or could have purchased any of the Class Vehicles if not for Defendants' fraud, because the EPA Certificates of Compliance that rendered them legal to sell in the United States were obtained only by cheating.

8.      Plaintiffs have suffered economic damages due to the steep diminution in value of their Class Vehicles, which pollute the environment at levels far in excess of the legal limits and cannot pass required emissions tests without cheating.

9.      To the extent the Class Vehicles can be repaired or retrofitted to pass federal and state emission requirements, they will, absent a full and comprehensive compensation program by Defendants, continue to suffer in diminution in value and cause economic loss. This is because any repairs or retrofits will reduce mileage per gallon and cause the vehicles to suffer lower performance, durability, and reliability, thereby reducing market value and increasing the cost of ownership and operation.

10.      On behalf of themselves, the Nationwide Class, and the State Classes, Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 *et seq.* ("RICO")), Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.* ("MMWA")), common law fraud, contract, warranty, unjust enrichment, and consumer protection laws of the states and the District of Columbia.

11.      Plaintiffs seek monetary damages, restitution, pollution mitigation, and injunctive and other equitable relief. In addition, Plaintiffs and Class members are entitled to a significant award of punitive or exemplary damages because Defendants deliberately, and with malice, deceived Plaintiffs and Class members for a period of years.

### III.      INTRADISTRICT ASSIGNMENT

12.      This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division. Several proposed Class members purchased and maintained their Class Vehicles in the counties served by this Division. Moreover, Defendants conduct substantial business in the counties served by this Division, Fiat Chrysler has marketed, advertised, and sold/leased the Class Vehicles in those counties, and has caused harm to Class members residing in those counties.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.     PARTIES

**A.     Plaintiffs**

13.     Plaintiff Matthew Fasching is a citizen of Idaho residing in Lowman, Boise County.

14.     Plaintiff Thomas McGann, Jr., is a citizen of New York residing in North Tonawanda, Niagara County.

15.     Plaintiff Joseph P. Neupert is citizen of West Virginia residing in Foster, Boone County.

16.     Plaintiff Bryan Muckenfuss is a citizen of South Carolina residing in Ravenel, Charleston County.

17.     Plaintiff Satyanam Singh is a citizen of California residing in Sacramento, Sacramento County.

18.     Plaintiff John Radziewicz is a citizen of Louisiana residing in New Orleans, Milan Parish.

19.     Plaintiff Binh Quoc Tran is citizen of California residing in Visalia, Tulare County.

**B.     Defendants**

20.     **FCA US LLC ("FCA")** is a limited liability company organized and existing under the laws of the State of Delaware, and is owned by holding company **Fiat Chrysler Automobiles N.V.** ("**Fiat**"), a Dutch corporation headquartered in London, United Kingdom. FCA was formed upon the acquisition of American automaker Chrysler by Fiat (through its Italian corporate predecessor, Fiat S.p.A.). FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

21.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA and its predecessor, Chrysler, are and were known as one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles

under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

22.    **Fiat Chrysler Automobiles N.V.** ("**Fiat**"), the corporate parent of FCA, also owns numerous European-based automotive brands in addition to FCA's American brands. Through subsidiary FCA Italy, these include Italian-based brands including Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth. Fiat also owns Ferrari and Maserati. As of as of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

23.    Fiat also owns several manufacturers of automotive parts, including diesel-engine manufacturer VM Motori. VM Motori developed and manufactured the "EcoDiesel®" engines at issue in this suit. Between 2000 and 2007, as now, VM Motori shared a corporate parent with the Chrysler brand, because it was owned wholly or partly by then-Chrysler owner DaimlerChrysler AG. DaimlerChrysler sold its stake in VM Motori in 2007. By the start of 2011, 50% of VM Motori was owned by General Motors and 50% by Penske Corporation. In early 2011, Fiat purchased Penske's 50% stake in VM Motori, and in October 2013, Fiat acquired the remaining 50% from General Motors.

24.    Fiat, through its subsidiary FCA, designs, manufactures, markets, distributes, and sells two models of vehicle for which the EcoDiesel® option is available: the Ram 1500 and the Jeep Grand Cherokee. The EcoDiesel® engine is a 3.0-liter V6 diesel engine developed by VM Motori.

25.    Fiat Chrysler, through its various entities, designs, manufactures, markets, distributes, and sells automobiles in California and multiple other locations in the U.S. and worldwide. Fiat Chrysler and/or its agents designed, manufactured, and installed the EcoDiesel® engine systems in the Class Vehicles. Fiat Chrysler also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

26.    Fiat Chrysler's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor

vehicle dealers. Fiat Chrysler is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States. The dealers act as FCA's agents in selling the Class Vehicles and disseminating information about the Class Vehicles to customers and potential customers.

27.     At all relevant times, Defendants manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Fiat Chrysler brand name throughout the United States. Defendants also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

### V.    PLAINTIFFS' FACTS

28.     Plaintiff **Mathue Fasching**, a resident of Lowman, Idaho, purchased a 2016 Ram 1500 on or about July 10, 2016 at Lithia Chrysler Jeep Dodge in Grants Pass, Oregon.

29.     Before buying the Ram 1500, he spent several months researching lower-emissions diesel trucks, but ultimately decided to buy the Ram over its competitors due to Defendants' promises regarding advanced clean diesel technology and reduced emissions. He relied on statements calling it "one of the cleanest and most economical diesels on the market" with "super low emissions [and] amazing fuel mileage" from FCA advertisements, websites and dealer personnel.

30.     The fuel economy and low emissions of the Ram 1500 were the primary reasons Mr. Fasching purchased the truck.

31.     Plaintiff **Thomas McGann, Jr.,** a resident of North Tonawanda, New York, bought a 2016 Ram 1500 EcoDiesel® on or about in September 24, 2016 at Lessord Dodge, an authorized FCA dealer in Sodus, New York.

32.     Before buying the Ram 1500, Plaintiff McGann researched lower-emissions diesel trucks, but ultimately decided to buy the Ram because of FCA's promises regarding advanced clean diesel technology and reduced emissions. He relied on statements about those characteristics in FCA

advertisements and websites. The fuel economy, reduced emissions, and towing power of the Ram 1500 were the primary reasons Plaintiff McGann purchased the truck.

33. Plaintiff **Joseph P. Neupert**, a resident of Foster, West Virginia, bought a 2015 Ram 1500 on or about in September 2016 at C&O Motors in St. Albans, West Virginia.

34. While purchasing the Ram 1500, he relied upon Defendants' promises of advanced clean diesel technology and reduced emissions. He believed, due to the name EcoDiesel®, that he was purchasing a vehicle good for the environment.

35. The fuel economy, reduced emissions, and towing power of the Ram 1500 were the primary reasons Mr. Neupert purchased the truck.

36. Plaintiff **Bryan Muckenfuss**, a resident of Ravenel, South Carolina bought a 2015 Dodge Ram 1500 on or about in November 5, 2015 at Rick Hendrick Dodge, an authorized FCA dealer in Charleston, South Carolina.

37. Before buying the Ram 1500, he researched lower-emissions diesel trucks, but ultimately decided to buy the Ram because of Defendants' promises regarding advanced clean diesel technology and reduced emissions. He relied on statements about those characteristics in Fiat Chrysler advertisements and websites.  The fuel economy, reduced emissions, and towing power of the Ram 1500 were the primary reasons Mr. Muckenfuss purchased the truck.

38. Plaintiff **Satyanam Singh**, a resident of Sacramento, California, purchased a new 2016 Ram 1500 EcoDiesel® on or about April 1, 2016 at AutoNation Chrysler Dodge Jeep Ram in Roseville, California.

39. Prior to purchasing the Class Vehicle, Plaintiff Singh reviewed television advertisements and websites regarding the Class Vehicle, and also researched other gasoline and diesel vehicles. Plaintiff Singh ultimately decided to purchase the Class Vehicle based on Defendants' representations of its fuel economy, reduced emissions, and powerful torque and engine performance.

40.    Plaintiff **John Radziewicz** a resident of New Orleans, Louisiana, purchased a pre-owned 2014 Jeep Grand Cherokee EcoDiesel® from Banner Chevrolet in New Orleans, Louisiana.

41.    Plaintiff Radziewicz purchased the diesel vehicle in large part for its great fuel efficiency and economy.

42.    Plaintiff **Binh Quoc Tran** resides in Visalia, California.  Plaintiff Tran purchased a 2014 Jeep Grand Cherokee EcoDiesel® from Tuttle-Click Chrysler Jeep Dodge Ram Tuttle-Click Inc. in Irvine, California in October 2014.

43.    Unknown to Plaintiffs, at the time they purchased their vehicles, they only achieved the promised fuel economy and performance because each was equipped with an emissions system that, during normal driving conditions, emitted many multiples of the allowed level of pollutants such as NOx. Fiat Chrysler's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the vehicles without proper emission controls has caused Plaintiffs' out-of-pocket loss, future attempted repairs, and diminished value of the vehicles. Fiat Chrysler knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs purchased the vehicles on the reasonable, but mistaken, belief that their vehicles were environmentally responsible vehicles, complied with U.S. emissions standards, were properly EPA certified, and would retain all of the promised fuel economy and performance throughout the vehicles' useful life.

44.    Plaintiffs selected and ultimately purchased their vehicles, in part, because of the EcoDiesel® system, as represented through advertisements and representations made by Fiat Chrysler. Plaintiffs and each Class member have suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the EcoDiesel® engine system, including, but not limited to, a high premium for the EcoDiesel® engine compared to what they would have paid for a gas-

1    powered engine, out-of-pocket losses and future attempted repairs, future additional fuel costs,

2    decreased performance of the vehicles, and diminished value of the vehicles.

3                    **VI.    JURISDICTION AND VENUE**

4        45.    This Court has subject matter jurisdiction over this action pursuant to the Class Action

5    Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse

6    citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in

7    controversy exceeds $5 million, exclusive of interest and costs. Subject-matter jurisdiction also arises

8    under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.* The Court has

9    personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), and Cal. Code Civ. P. §

10   410.10, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

11       46.    This Court has personal jurisdiction over Defendants because they have minimum

12   contacts with the United States, this judicial district, and this State, and intentionally availed themselves

13   of the laws of the United States and this state by conducting a substantial amount of business throughout

14   the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Fiat

15   Chrysler vehicles in this State and District. At least in part because of Defendants' misconduct as

16   alleged in this lawsuit, Class Vehicles ended up on this state's roads and in dozens of franchise

17   dealerships. This Court has specific jurisdiction over FCA and Fiat because both have purposefully

18   availed themselves of this forum by directing their agents and distributors to take action here. Fiat

19   closely directed the actions of its agents in advertising and selling the cars FCA manufactures in the

20   United States.

21       47.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of

22   the events and/or omissions giving rise to Plaintiffs' claims occurred in this District. Fiat Chrysler has

23   marketed, advertised, sold, and leased the Class Vehicles, and Defendants otherwise conducted

24   extensive business within this District. Several named Plaintiffs and proposed Class representatives, as

well as tens of thousands of Class members, purchased their Class Vehicles from the multiple Fiat

Chrysler dealers located in this District. The California Air Resources Board's Notice of Violation states

that there are about 14,000 Class Vehicles on the road in California, and relevant documents and

witnesses may be found in the Northern District and throughout California, given CARB's in

uncovering defendants' use of defeat devices on its diesel engines and issuing a Notice of Violation.

## VII.    FACTS COMMON TO ALL COUNTS

### A.    The Defeat Device Scheme

48.    On January 12, 2017, the EPA and CARB announced to the world that Defendants, just

like Volkswagen before them, had violated the Clean Air Act in an attempt to reap profits at the expense

of the air we breathe and the confidence of its own consumers.

49.    The EPA's Notice of Violation of the Clean Air Act alleges that Defendants installed and

failed to disclose engine management software in light-duty model year 2014, 2015 and 2016 Jeep

Grand Cherokees and Ram 1500 trucks with 3.0-liter diesel engines sold in the United States. The

undisclosed software results in increased emissions of nitrogen oxides (NOx) from the vehicles.

50.    In announcing the Notice of Violation, Cynthia Giles, Assistant Administrator for EPA's

Office of Enforcement and Compliance Assurance, said: "Failing to disclose software that affects

emissions in a vehicle's engine is a serious violation of the law, which can result in harmful pollution in

the air we breathe." She further noted that the EPA will "investigate the nature and impact of these

devices. All automakers must play by the same rules, and we will continue to hold companies

accountable that gain an unfair and illegal competitive advantage."

51.    Through its own testing at the National Vehicle and Fuel Emissions Laboratory, the EPA

discovered eight undisclosed Auxiliary Emission Control Devices ("AECDs"). These devices were not

disclosed to in Defendants' applications for certificates of conformity (COCs), which designates

approved vehicles for sale in the United States. Defendants knew disclosure was required under applicable regulations, yet did not disclose the existence of these devices.

52.     The mere existence of these AECDs leaves FCA in violation of Section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), for each and every time an offending vehicle was sold, offered for sale, introduced into commerce, or delivered for introduction into commerce or imported.

53.     Over 100,000 vehicles on the roads of the United States are affected by Defendants' unlawful and deceitful conduct.

54.     EPA testing indicates that at least some of these devices "appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emissions standards," as opposed to during "normal operation and use." This is the definition of a defeat device, which is designed to pass lab certification tests but expel more emissions in the real world in order to achieve greater fuel economy or performance.

55.     In the aftermath of Volkswagen's own strikingly similar emissions scandal, the EPA announced on September 25, 2015 that it would conduct additional testing of vehicles on the market "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for purposes of investigating a potential defeat device." This testing led to the discovery of Fiat Chrysler's own nefarious conduct.

56.     The EPA's Notice of Violation notes that, despite having the opportunity to do so, Fiat Chrysler has failed to show that it did not know, or should not have known, that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act.]"

57.     The same day, CARB publicly announced that it, too, has issued a Notice of Violation to Defendants after detecting the AECDs in Defendants' 2014, 2015, and 2016 Jeep Grand Cherokee and

Ram 1500 EcoDiesel® vehicles. CARB also said the company failed to disclose the devices, which it said can "significantly increase" NOx emissions when activated.

58.    Defendants' fraudulent scheme was motivated by the desire to expand market share in the United States by adding diesel engines to FCA's light truck and SUV lineup. Dodge and Ram were already well known for their heavy-duty trucks equipped with large 8-cylinder engines supplied by Cummins.[1] Unlike in Europe, where diesel engines in economy cars and small commercial vehicles have long been popular, diesel engines were stigmatized in the United States. Many consumers perceived diesel engines as emitting thick smoke and dangerous pollutants, based on earlier engines of the 1980s and early 1990s. Successful as they were, Dodge and Ram Cummins-equipped heavy-duty trucks contributed to this perception in a certain way: a community of enthusiasts has grown around "rolling coal"—that is, modifying the vehicles' emissions systems to belch black clouds of smoke and particulates.

59.    However, other manufacturers—most notably, Volkswagen—had begun selling smaller, more economical vehicles in the U.S. with diesel engines as environmentally-friendly, fuel-efficient alternatives to hybrids and other economical vehicles. Like Volkswagen, Fiat had considerable expertise with diesel engines in Europe, primarily through its subsidiary VM Motori, a leading supplier of diesel engines. Prior to Fiat's takeover of Chrysler, when VM Motori was controlled by DaimlerChrysler and then General Motors, VM Motori supplied diesel engines for use in Chrysler/Jeep and General Motors automobiles.

60.    The engine at issue—now known as "EcoDiesel®," a 3.0-liter, six-cylinder turbodiesel—had been under development before Fiat acquired any of VM Motori for use in a General Motors

---

[1] Ram Trucks became a separate brand from Dodge, rather than a Dodge model name, only after Fiat's acquisition.

automobile for the European market.[2]

61.    After acquiring a 50% stake in VM Motori, Defendants set about integrating a 3.0-liter, six-cylinder V.M. Motori turbodiesel engine into FCA's popular light-duty trucks and SUVs, the Ram 1500 pickup and the Jeep Grand Cherokee, purportedly offering the benefits of diesel performance and fuel economy to a market quite distinct from those who bought heavy-duty, Cummins-equipped Ram 2500 and 3500 trucks.

62.    As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. …We combined resources and developed them together."[3]

63.    On information and belief, because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a defeat device was necessary to certify the engine to U.S. emissions standards and include it in FCA vehicles.

64.    The modern type of smaller, turbocharged, direct-injected diesel engines, like Volkswagen's "Clean Diesel" TDI and Fiat Chrysler's EcoDiesel® engines, offer several benefits that maximize the potential of diesel fuel. Turbochargers force air into the combustion chambers, aiding in achieving higher compression, enhancing the efficiency with which power is extracted from the fuel. Direct fuel injection allows a sophisticated engine management computer to precisely manage the air-fuel mixture at all times to maximize power and efficiency.

65.    The EcoDiesel® option, however, is not cheap for environmentally-conscious consumers. For example, the feature is only available on the three most expensive 2014 Grand Cherokee models and

---

[2] "An Inside Look at the Ram 1500 3.0L EcoDiesel," Engine Labs, Jan. 11, 2015 (last accessed Jan. 14, 2017). Available: http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/
[3] *Id.*

adds $4,500 to those vehicles' overall price.[4] The EcoDiesel® option on the 2015 Ram 1500 adds between $3,120 and $4,960.[5]

66.      In addition to the dollars-and-cents costs, diesel still comes with an environmental trade-off: high emissions of particulates and oxides of nitrogen. $NO_X$ is a hazardous pollutant and "an indirect greenhouse gas" that contributes to the formation of ground-level ozone, a greenhouse gas, and can travel hundreds of miles from the source of emission. Ozone is a colorless and odorless gas that, even at low levels, can cause cardiovascular and respiratory health problems, including chest pain, coughing, throat irritation, and congestion. The human health concerns from over-exposure to $NO_X$ are well established, and include negative effects on the respiratory system, damage to lung tissue, and premature death. $NO_X$ can penetrate deeply into sensitive parts of the lungs, and is known to cause or worsen respiratory diseases like asthma, emphysema, and bronchitis, as well as to aggravate existing heart disease. Children, the elderly, people with lung diseases such as asthma, and people who work or exercise outside are particularly susceptible to such adverse health effects, though the impact of NOx is borne by all of society.

67.      Given the dangers of NOx, technology offers a solution. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

---

[4] 2014 Jeep Grand Cherokee EcoDiesel® V-6, http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6-first-drive-review (last visited Jan. 12, 2017).

[5] 2015 Ram 1500 EcoDiesel® 4x4, http://www.caranddriver.com/reviews/2015-ram-1500-4x4-ecodiesel-4x4-test-review (last visited Jan. 14, 2017).

68.     The Class Vehicles use engine management computers to monitor sensors throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions performance for different driving situations.

69.     The computer that manages these systems in the Class Vehicles is an "electronic diesel control" or "EDC." The "defeat device" consists of software programming on this computer capable of detecting when the Class Vehicles are undergoing emissions testing through certain sensor inputs that monitor vehicle speed, engine operation, steering wheel positioning, and the like. This type of defeat device has been termed a "cycle detection defeat device" because it detects when a vehicle is being tested and then operates the engine and emissions controls in such a way that the vehicles pass emissions testing. Because the measures required to pass emissions testing resulted in some combination of traits that would be undesirable in normal operation—such as greater fuel consumption, lower performance, or unsustainable consumption of the urea solution used in SCR—the Defendants ensured that at all other times, the Class Vehicles operated in a manner that polluted many times more than the legal emissions limits.

**B.      Applicable Emissions Standards & Testing**

70.     When a manufacturer wishes to introduce a new car in the U.S. market, it must obtain a certificate of conformity ("COC") from the EPA, by showing that the vehicle comports with the requirements of the Clean Air Act, 42 USC § 7522 and 40 CFR 86.1843-01.

71.     As part of that certification process, the manufacturer must disclose any "auxiliary emission control devices" ("AECDs") that are included in the vehicle. AECDs are "any element of design which senses temperature, vehicle speed…or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 CFR 86.1803-01. All vehicles have AECDs, and there is nothing per se illegal about modulating the operation

of emissions control systems. However, in applying for a COC, the manufacturer must list all AECDs in the vehicles, and then justify why they are not defeat devices. 40 CFR 86.1844-01(d)(11). Thus, Defendants' willful omission violates the CAA.

72.    40 CFR 86.1803-01 provides that: "Defeat device means an auxiliary emission control device (AECD) that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use, unless:

> **(1) Such conditions are substantially included in the Federal emission test procedure;**
>
> **(2) The need for the AECD is justified in terms of protecting the vehicle against damage or accident; or**
>
> **(3) The AECD does not go beyond the requirements of engine starting."**

73.    Here, because the Class Vehicles are equipped with a Defeat Device and passed emissions testing only by cheating, they should never have received COCs that rendered them legal to sell in the U.S.

74.    Plaintiffs' counsel has retained experts to analyze and test the subject vehicles, and on-road tests of Class Vehicles showed that FCA EcoDiesel® produces NOx emissions well above legal limits.

75.    A 2014 Ram 1500 equipped with a 3.0L EcoDiesel® engine and featuring selective catalytic reduction (SCR) NOx after-treatment technology was tested on a chassis dynamometer as well as on the road. In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THS) were measured on a continuous basis using a real-time particle sensor from Pegasor.

76.    The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (i.e., in the laboratory). The vehicle produced

approximately 15-19 times more NOx on the road than the certification standard allows. Moreover, the NOx emissions during highway driving conditions exceeded the EPA Tier 2 Bin 5 standard under which the vehicle was certified by *35 times*.

**C.     Defendants Marketed the Class Vehicles as Environmentally Friendly, Emissions-Compliant, and Fuel-Efficient.**

77.     FCA's EcoDiesel® vehicles are aggressively marketed as offering a combination of power, efficiency, and environmental cleanliness that competitors cannot match: the Class Vehicles' "exhaust is ultra-clean" due to their "advanced emissions-control technology." Specifically, the "emissions control system helps ensure that virtually no particulates and minimal [NOx] exit the tailpipe."

78.     The Class Vehicles are also represented to be emission-compliant in all 50 states (see image below, featuring the slogan "love the planet along with great fuel economy?"). That claim is bolstered by the inclusion of an Emissions Warranty guaranteeing compliance with applicable emissions regulations, which Defendants placed in the owner's manuals of Class Vehicles.



79.     The Defendants represented Class Vehicles as offering excellent fuel economy: greater than a comparable gasoline engine and offering a range of 730 miles on a single tank of diesel fuel, and "the best fuel economy of any full-size pickup" (examples below).





80.     FCA's website even offers calculators purporting to show how much fuel, time and money consumers could save. For example:



81.     But unbeknownst to those consumers—consumers who Fiat Chrysler identified as wanting "an efficient, environmentally-friendly truck without sacrificing capability or performance—Defendants could only achieve those impressive results by cheating on emissions testing. Moreover, in normal driving, the vehicles polluted much more than advertised or permissible by applicable laws.

## VIII.   CLASS ACTION ALLEGATIONS

82.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

**Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of a FCA "Class Vehicle." Class Vehicles include, without limitation, all FCA EcoDiesel® vehicles equipped with selective catalytic reduction ("SCR") to control NOx emissions, including but not limited to the Ram 1500 and the Jeep Grand Cherokee.

83.     In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure Rule 23(c)(5), Plaintiffs seek to represent the following National Subclasses (hereinafter "Subclasses") as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Current Owners**:

All persons or entities that currently own and/or lease a Class Vehicle.

**Former Owners and Lessees**:

All persons or entities that purchased and/or leased a Class Vehicle, but who no longer hold title to such a Vehicle.

84.     Excluded from the Class are individuals who have personal injury claims resulting from the "defeat device." Also excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

85.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

86.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

87.     Plaintiffs reserve the right to modify and/or add to the Nationwide and/or State Classes prior to class certification.

### 1.      Numerosity: Federal Rule of Civil Procedure 23(a)(1)

88.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not fewer than 100,000 members of the Class, the precise number of Class members is unknown to

Plaintiffs, but it may be ascertained from Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

2.    **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

89.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)    Whether Defendants engaged in the conduct alleged herein;

(b)    Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

(c)    Whether the emissions control system in the Class Vehicles contains a defect in that it does not comply with EPA requirements;

(d)    Whether the emissions control systems in Class Vehicles can be made to comply with EPA standards without substantially degrading the performance of the Class Vehicles;

(e)    Whether Defendants knew about the defeat device and, if so, how long Defendants have known;

(f)    Whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a "defeat device;"

(g)    Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

(h)    Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

(i)    Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief;

(j)    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

(k)     Whether Defendants continue to unlawfully conceal and misrepresent whether additional vehicles, besides those reported in the press to date, are in fact Class Vehicles.

### 3.     Typicality: Federal Rule of Civil Procedure 23(a)(3)

90.     Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class Member purchased an Affected Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Neither Plaintiffs nor the other Class members would have purchased the Class Vehicles had they known of the defects in the vehicles. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

### 4.     Adequacy: Federal Rule of Civil Procedure 23(a)(4)

91.     Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle defect litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### 5.     Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)

92.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### 6.    Superiority: Federal Rule of Civil Procedure 23(b)(3)

93.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

94.    Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IX.    ANY APPLICABLE STATUES OF LIMITATION ARE TOLLED

95.    The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

96.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing and misrepresenting the true emissions levels of their vehicles, including but not limited to their use of defeat devices.

97.    Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, or that Defendants had intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers, until shortly before this action was filed.

98.    Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of its sophisticated emissions deception and that they concealed that information, which was only discovered by Plaintiffs shortly before this action was filed.

**A.    Tolling Due To Fraudulent Concealment**

99.    Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

100.    Upon information and belief, prior to the date of this Complaint, if not earlier, Defendants knew of the defeat device in the Class Vehicles, but continued to distribute, sell, and/or lease the Class Vehicles to Plaintiffs and the class members. In doing so, Defendants concealed and expressly denied the existence of problem with NOx emissions, and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Vehicles.

101.    Instead of disclosing their deception, or that the emissions from the Class Vehicles were far worse than represented, Defendants falsely represented that its vehicles complied with federal and state emissions standards, and that they were reputable manufacturers whose representations could be trusted.

**B.    Estoppel**

102.    Defendants have a continuous and on-going duty to tell the truth about their products and to disclose to Plaintiffs and the other Class members the facts that they knew about the emissions from Class Vehicles, and of those vehicles' failure to comply with federal and state laws.

103.    Although they had the duty throughout the relevant period to disclose to Plaintiffs and Class members that they had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Class Vehicles, and

intentionally misrepresented their blatant and deceptive lack of compliance with federal and state law regulating vehicle emissions and clean air.

104. Defendants actively concealed the true character, quality, performance, and nature of the defeat device in the Class Vehicles, and Plaintiffs and the class members reasonably relied upon Defendants' knowing and active concealment of these facts.

105. Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## X. CAUSES OF ACTION

**A. Claims Asserted on Behalf of the Entire Class**

### COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")
### Violation of 18 U.S.C. § 1962(c)-(d)

106. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

107. Plaintiffs bring this Count on behalf of the Nationwide Class.

108. At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

109. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

110. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

111. In order to compete with vehicle manufacturers like Volkswagen (which successfully introduced a line of "environmentally-friendly" diesel-engine vehicles in the United States) and increase their market share, Defendants sought to add diesel engines to their light truck and SUV lineup. But, due

to the strict emissions control requirements imposed by U.S. law and the demands of consumers in the United States, they found it impossible to achieve their goals lawfully, and instead resorted to cheating through a fraudulent scheme and conspiracy. The illegal scheme was hatched overseas by Fiat Chrysler Automobiles N.V., brought to U.S. shores by and through the vehicles of FCA US LLC, and executed in conjunction with Fiat's subsidiary companies overseas, including VM Motori.

112.    Specifically, Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of a RICO enterprise (defined below and referred to collectively as the "Defeat Device RICO Enterprise"), whose purpose was to deceive regulators and the driving public into believing that the Class Vehicles were compliant with emission standards, clean, fuel efficient and environmentally friendly so as to increase revenues and minimize losses from the design, manufacture, distribution and sale of the Class Vehicles and the defeat devices installed therein. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of billions of dollars from Plaintiffs and the Class. As explained in detail below, Defendants' years-long misconduct violated Sections 1962(c) and (d).

### a.    Description of the Defeat Device RICO Enterprise

113.    In an effort to expand its global reach, market share, and standardized marketing and sales in the U.S., Italian automaker Fiat (then controlled by an Italian holding company) acquired American automaker Chrysler. This acquisition occurred gradually over a period of years, between 2009 and 2014 and resulted in the creation of FCA US LLC. All Fiat assets, including both FCA US and FCA Italy and their respective subsidiaries, were later merged into Fiat Chrysler Automobiles N.V., a new Dutch holding company, in 2014.

114.    At all relevant times, Defendants maintained tight control over the design, manufacture, and testing of the Class Vehicles. Their business operations in the United States include, for example,

the manufacture, distribution, and sale of motor vehicles and parts through their network of independent, franchised motor vehicle dealers.

115.     At all relevant times, Defendants, along with other individuals and entities, including unknown or additional third parties involved in the design, manufacture, testing, and sale of the Class Vehicles, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining certificates of compliance from the Environmental Protection Agency (and executive orders from CARB) in order to sell Class Vehicles containing defeat device(s) throughout the U.S., and through which they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

116.     Specifically, Fiat Chrysler Automobiles N.V. and/or FCA US LLC are the entities that applied for, and obtained, the EPA certificates of compliance for the Fiat-Chrysler branded Class Vehicles with material misrepresentations and omissions about their specifications in order to introduce them into the U.S. stream of commerce.

117.     Defendants used their network of independent, franchised motor vehicle dealers to distribute and sell the illegal Class Vehicles throughout the U.S.

118.     VM Motori participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, testing, and/or supplying V6 diesel engines which contained and concealed unlawful defeat device(s) to Defendants.

119.     VM Motori began development of this engine before its acquisition by Fiat.[6] Fiat acquired half of VM Motori in 2011, and completed its acquisition only in late 2013, after the engine and the Class Vehicles had been developed, certified by the EPA, and put on sale in the United States.[7]

---

[6] "Fiat-Chrysler 3.0L Diesel V6 Was Originally a GM Engine," GM Authority, July 16, 2013 (last visited Jan. 14, 2017). Available: http://gmauthority.com/blog/2013/07/fiat-chrysler-3-0l-diesel-v6-is-actually-a-gm-engine/

[7] "Fiat Buys Remainder of Diesel Manufacturer VM Motori From GM," Automotive News, October 28, 2103 (last visited Jan. 14, 2017). Available: www.autonews.com/article/20131028/OEM10/131029887/fiat-buys-remainder-of-diesel-maker-vm-motori-from-gm

120.    The separate legal statuses of Defendants and VM Motori facilitated the fraudulent scheme and attempted to provide a shield from liability for Defendants and their co-conspirators.

121.    Alternatively, Defendants, their subsidiaries, and their directors, officers, and engineers constitute a single "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which Defendants conducted their pattern of racketeering activity in the U.S. The enterprises, alleged in this and the previous paragraphs, are referred to collectively as the "Defeat Device RICO Enterprise."

122.    At all relevant times, the Defeat Device RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

123.    The association-in-fact Defeat Device RICO Enterprise consisted of the following entities and individuals:

**(i)    The Fiat-Chrysler Entity Defendants**

124.    Fiat Chrysler Automobiles N.V. and its American subsidiary FCA US LLC, working with the other below-described members of the Defeat Device RICO Enterprise, devised a scheme to illegally circumvent the U.S.'s stringent emissions standards by incorporating a "defeat device" into the Class Vehicles' engine management computers.

125.    Employing this technology, Defendants fraudulently obtained certificates of compliance (and executive orders) for the Class Vehicles, even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions

126.    Moreover, to profit from the scheme and increase their sales, Defendants falsely marketed the Class Vehicles as not only compliant but clean, fuel-efficient and environmentally-friendly vehicles.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(ii)    **VM Motori**

127.    VM Motori S.p.A. ("VM Motori") is a diesel engine manufacturer based in in Cento, Italy. In 2011, Fiat purchased a 50% share of the company from Penske Corporation. General Motors controlled the other 50%. Fiat bought the remaining 50% from General Motors in late 2013, after the Class Vehicles and engines had already been developed, certified by the EPA, and offered for sale in the United States.

128.    Back in 2010 or 2011, VM Motori announced a new product line of a V6, 3.0L displacement engines for inclusion in SUVs, trucks, and large sedans. These engines had been under development for use in a General Motors automobile for the European market. [8]

129.    However, further development for use in FCA vehicles took place following Fiat's acquisition of 50% of VM Motori in 2011. As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine. …We combined resources and developed them together."[9]

130.    According to their website, VM Motori is deeply involved in the development of testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."[10]

131.    In fact, VM Motori makes specific mention of their involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.),"[11] And notes that their

---

[8] "An Inside Look at the Ram 1500 3.0L EcoDiesel," Engine Labs, Jan. 11, 2015 (last accessed Jan. 14, 2017). Available: http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/

[9] *Id.*

[10] VM Motori, *Research and Development* (last accessed Jan. 13, 2017), available: http://www.vmmotori.com/r-s/vm-motori/r-s-2.html

[11] *Id.*

facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[12]

132.    During all relevant periods, VM Motori developed and supplied engines for the Class Vehicles which contained, were calibrated to, or suppressed the existence of a defeat device, in furtherance of the Defeat Device RICO Enterprise.

**b.    The Defeat Device RICO Enterprise Sought to Increase Defendants' Profits and Revenues**

133.    Because the engine had originally been developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent, inclusion of a defeat device was necessary to certify the engine to U.S. emissions standards and include it in FCA vehicles.

134.    At all relevant times, the Defeat Device RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendants, their subsidiaries, officers, executives, and engineers, VM Motori, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Class Vehicles to Plaintiffs and the Nationwide Class through fraudulent certificates of compliance and executive orders, false emissions tests, deceptive and misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the Defeat Device RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.

135.    The Defeat Device RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain

---

[12] *Id.*

defeat devices. However, Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

136.    The Defeat Device RICO Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the sale of the same.

137.    Within the Defeat Device RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Defeat Device RICO Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

138.    Each participant in the Defeat Device RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Defeat Device RICO Enterprise, Defendants functioned as a unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

139.    Defendants participated in the operation and management of the Defeat Device RICO Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the enterprise, they had and have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

140.    Defendants exerted substantial control over the Defeat Device RICO Enterprise, and participated in the affairs of the Defeat Device RICO Enterprise by:

A.    designing the Class Vehicles with defeat devices;

B.    failing to correct or disable the defeat devices;

C.    manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

D.    misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on certificate of compliance and executive order applications;

E.    introducing the Class Vehicles into the stream of U.S. commerce without a valid EPA certificate of compliance and/or CARB executive order;

F.    concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

G.    misleading the driving public as to the nature of the defeat devices and the defects in the Class Vehicles;

H.    designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

I.    otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators;

J.    illegally selling and/or distributing the Class Vehicles;

K.    collecting revenues and profits from the sale of such products; and

L.    ensuring that the other RICO Defendants and unnamed co-conspirators complied with the fraudulent scheme.

141.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands.

### c.    Mail and Wire Fraud

142.    To carry out, or attempt to carry out the scheme to defraud, Defendants, each of whom is a person associated-in-fact with the Defeat Device RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Defeat Device RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

143.    Specifically, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity which Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Defeat Device RICO Enterprise. Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

144.    Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

145.    In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Nationwide Class or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal

scheme, Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

146.    Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

Mail Fraud: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

Wire Fraud: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

147.    Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

A.    the Class Vehicles themselves;

B.    component parts for the defeat devices;

C.    essential hardware for the Class Vehicles;

D.    falsified emission tests;

E.    fraudulent applications for EPA certificates of compliance and CARB executive orders;

F.    fraudulently-obtained EPA certificates of compliance and CARB executive orders;

G.    vehicle registrations and plates as a result of the fraudulently-obtained EPA certificates of compliance and CARB executive orders;

H.    documents and communications that facilitated the falsified emission tests;

I.    false or misleading communications intended to lull the public and regulators from discovering the defeat devices and/or other auxiliary devices;

J.    sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

K.    documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.    documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

M.   payments to VM Motori;

N.    millions of dollars in compensation to Fiat and FCA executives;

O.    deposits of proceeds; and

P.    other documents and things, including electronic communications.

148.    Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, Defendants, made misrepresentations about the Class Vehicles on their websites, YouTube[13], and through advertisements online, all of which were intended to mislead regulators and the public about the fuel efficiency, emissions standards, and other performance metrics.

149.    For example, as pictured below and in numerous examples above, Defendants announced that the EcoDiesel® engine, installed in the Jeep Grand Cherokee is "efficient" and environmentally friendly: "leaving little trace of being there."

---

[13] See, e.g., Jeep, *2014 Grand Cherokee – 3.0L EcoDiesel® Engine* (Last Accessed 1/13/17), https://www.youtube.com/watch?v=TMJYIyiBkZk

1

2



3

4

5

6

7

8

9

10

150.   Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate

electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party

entities in furtherance of the scheme

151.   The mail and wire transmissions described herein were made in furtherance of

Defendants' scheme and common course of conduct to deceive regulators and consumers and to lure

consumers into purchasing the Class Vehicles, which Defendants knew or recklessly disregarded as

emitting illegal amounts of pollution, despite their advertising campaign.

152.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire

facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and

records. However, Plaintiffs have described the types of, and in some instances, occasions on which the

predicate acts of mail and/or wire fraud occurred. They include thousands of communications to

perpetuate and maintain the scheme, including the things and documents described in the preceding

paragraphs.

153.   Defendants have not undertaken the practices described herein in isolation, but as part of

a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate

18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-

No.                                    37                    CLASS ACTION COMPLAINT

party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

154.     Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

155.     To achieve their common goals, Defendants hid from the general public the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect

156.     Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

157.     Indeed, for the conspiracy to succeed each of Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Class Vehicles.

158.     Defendants knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles. Defendants knew and intended that consumers would incur costs as a result. As fully alleged herein, Plaintiffs, along with hundreds of thousands of other consumers, relied upon Defendants' representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that they purchased illegal vehicles that never should have been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by Defendants.

159.     As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations and omissions, while providing Class Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

160.     The predicate acts all had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Defendants through their participation in the Defeat Device RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Class Vehicles.

161.     During the design, manufacture, testing, marketing and sale of the Class Vehicles, Defendants shared technical, marketing, and financial information that revealed the existence of the defeat devices contained therein. Nevertheless, Defendants shared and disseminated information that deliberately misrepresented the Class Vehicles as legal, clean, environmentally friendly, and fuel efficient.

162.     By reason of, and as a result of the conduct of Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

A.     Purchase or lease of an illegal, defective Class Vehicle;

B.     Overpayment for a Class Vehicle;

C.     The value of the Class Vehicles has diminished, thus reducing their resale value;

D.     Other out-of-pocket and loss-of-use expenses;

E.     Payment for alternative transportation; and

F.     Loss of employment due to lack of transportation.

163.     Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**FRAUD BY CONCEALMENT**
**(Common Law)**

164.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

165.     Plaintiffs bring this claim on behalf of themselves and the Class.

166.     Defendants designed, manufactured, marketed, sold, and/or leased Class Vehicles to Plaintiff and the California Class members. Defendants represented to Plaintiff and the Class members in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles had no significant defects, complied with EPA and state emissions regulations, and would perform and operate properly when driven in normal usage.

167.     Defendants intentionally concealed and suppressed material facts concerning the illegality and quality of the Class Vehicles in order to defraud and mislead both regulators and the Class about the true nature of the Class Vehicles. Defendants accomplished their scheme (and the concealment thereof) by installing, aiding in the installation of, and/or failing to disclose the defeat devices in the Class Vehicles that caused the vehicles to operate in a low-emission test mode only during testing.

168.     The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during

laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings. Plaintiffs and Class members reasonably relied upon Defendants' false representations. They had no way of knowing that Defendants' representations were false and gravely misleading. As alleged herein, Defendants employed sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Defendants' deception on their own.

169.    Defendants concealed and suppressed material facts concerning their true corporate cultures—cultures characterized by an emphasis on profits and sales above compliance with federal and state clean air law and emissions regulations that are meant to protect the public and consumers. They also emphasized profits and sales above the trust that Plaintiffs and Class members placed in their representations. Consumers buy diesel cars from FCA because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Class Vehicles are doing during real-world driving conditions.

170.    Necessarily, Defendants also took steps to ensure that its employees did not reveal the details of their deception to regulators or consumers, including Plaintiffs and Class members. Defendants did so in order to boost the reputations of their vehicles and to falsely assure purchasers and lessors of their vehicles, including certified previously owned vehicles, that they are reputable manufacturers that comply with applicable law, including federal and state clean air and emissions regulations, and that their vehicles likewise comply with applicable laws and regulations

171.    Defendants' false representations were material to consumers, both because they concerned the quality of the Defeat Device Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Defendants well knew, their customers,

including Plaintiffs and Class members, highly valued that the vehicles they were purchasing or leasing were so-called EcoDiesel® vehicles with *reduced emissions*—a label only made possible by concealing the vehicles' true emissions levels from regulators.

172.    Defendants had a duty to disclose the emissions deception they engaged in with respect to the vehicles at issue because knowledge of the deception and its details were known and/or accessible only to Defendants, Defendants had exclusive knowledge as to implementation and maintenance of their deception, and Defendants knew the facts were unknown to or not reasonably discoverable by Plaintiffs or Class members.

173.    Defendants also had a duty to disclose because they made general affirmative representations about the qualities of their vehicles with respect to emissions standards which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding their emissions deception, the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue.

174.    Having volunteered to provide information to Plaintiffs and the Class, Defendants had the duty to disclose the entire truth. These omitted and concealed facts were material because they directly affect the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendants represented to Plaintiffs and Class members that they were purchasing or leasing *reduced emission* vehicles, and certification testing appeared to confirm this—except that, secretly, Defendants had thoroughly subverted the testing process.

175.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that their vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and Defendants did so at the expense of Plaintiffs and Class members.

176.    On information and belief, Defendants have still not made full and adequate disclosures and continue to defraud Plaintiffs and Class members by concealing material information regarding both the emissions qualities of their vehicles and their emissions deception.

177.    Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly compliant cars manufactured by Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or Class members.

178.    Because of the concealment and/or suppression of the facts, Plaintiffs and Class members have sustained damages because they own vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions and Defendants' failure to timely disclose the defect or defective design of the EcoDiesel® engine system, the actual emissions qualities and quantities of hundreds of thousands of Ram- and Jeep-branded vehicles, and the serious issues engendered by Defendants' corporate policies. Had Plaintiffs and Class members been aware of Defendants' emissions deceptions with regard to the vehicles at issue, and their callous disregard for compliance with applicable federal and state law and regulations, Plaintiffs and Class

members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

179.    The value of Plaintiffs' and Class members' vehicles has diminished as a result of Defendants' fraudulent concealment of their emissions deception, which has greatly tarnished the brand names attached to Plaintiffs' and Class members' vehicles and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

180.    Accordingly, Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial.

181.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

182.    Plaintiffs plead this count pursuant to the laws of California, where Defendants have significant operations, on behalf of all members of the Class. As necessary, and in the alternative, Plaintiffs do and may allege further sub-classes, based on the residences at pertinent times of members of the Class, to allege fraudulent concealment under the laws of states other than California.

## COUNT III
## BREACH OF CONTRACT

183.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

184.    Plaintiffs brings this Count on behalf of themselves and the Class.

185.    Defendants' misrepresentations and omissions alleged herein, including Defendants' failure to disclose the existence of the "defeat device" and/or defective design as alleged herein, caused

Plaintiffs and the other Class members to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these Class Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the "defeat device." Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefits of their bargains.

186.    Each and every sale or lease of a Defective Vehicle constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing Plaintiffs' and the other Class members' Class Vehicles and by misrepresenting or failing to disclose the existence of the defeat device and/or defective design, including information known to Defendants rendering each Defeat Device Vehicle non-compliant with applicable emissions standards, and thus less valuable, than vehicles not equipped with defeat devices.

187.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV
## IMPLIED AND WRITTEN WARRANTY
### Magnuson - Moss Warranty Act (15 U.S.C. §§ 2301, *et seq.*)

188.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

189.    Plaintiffs assert this cause of action on behalf of themselves and the other members of the Class.

190.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 15 U.S.C. § 2310(d).

191.    Defendants' Class Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

192.    Plaintiffs and Class members are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

193.    Each Defendant is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

194.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied or written warranty.

195.    As described herein, Defendants provided Plaintiffs and Class members with "implied warranties" and "written warranties" as those terms are defined in 15 U.S.C. § 2301.

196.    Defendants have breached these warranties as described in more detail above. Without limitation, Defendants' Class Vehicles are defective, as described above, which resulted in the problems and failures also described above.

197.    By Defendants' conduct as described herein, including knowledge of the defects inherent in the vehicles and Defendants' action, and inaction, in the face of the knowledge, Defendants have failed to comply with their obligations under their written and implied promises, warranties, and representations.

198.    In their capacity as warrantors, and by the conduct described herein, any attempts by Defendants to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective the software and supporting systems is null and void.

199.    All jurisdictional prerequisites have been satisfied.

200.    Plaintiffs and members of the Class are in privity with Defendants in that they purchased the software from Defendants or their agents.

201.    As a result of Defendants' breach of warranties, Plaintiffs and Class members are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant

to 15 U.S.C. § 2310.

## COUNT V
## UNJUST ENRICHMENT

202.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

203.    Plaintiffs bring this count on behalf of themselves and, where applicable, the Class.

204.    Plaintiffs and members of the Class conferred a benefit on Defendants by, inter alia, using (and paying a premium for) its vehicles.

205.    Defendants have retained this benefit, and know of and appreciate this benefit.

206.    Defendants were and continue to be unjustly enriched at the expense of Plaintiffs and Class members.

207.    Defendants should be required to disgorge this unjust enrichment.

## COUNT VI
## VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT
### (6 Del. Code § 2513, *et seq.*)

208.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

209.    Plaintiffs bring this action on behalf of themselves and the National Class.

210.    Defendants are "person[s]" within the meaning of 6 Del. Code § 2511(7).

211.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

212.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

213.    Plaintiffs and Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiffs and National Class members did not and could not unravel Defendants' deception on their own.

214.    Defendants thus violated the Act by, at minimum: by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

215.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Delaware CFA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

216.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare.

"Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the Delaware CFA.

217.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

218.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the National Class.

219.    Defendants knew or should have known that their conduct violated the Delaware CFA.

220.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

C.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

221.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the

stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

222.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the National Class.

223.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Class Vehicles.

224.    Plaintiffs and the National Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiffs and the National Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

225.    Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Delaware CFA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

226.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

227.    As a direct and proximate result of Defendants' violations of the Delaware CFA, Plaintiffs and the National Class have suffered injury-in-fact and/or actual damage.

228.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of Defendants' unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

229.    Defendants engaged in gross, oppressive or aggravated conduct justifying the imposition of punitive damages.

### COUNT VII
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (6 Del. Code §§ 2-314 and 2A-212)

230.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

231.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

232.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

233.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

234.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212)

235.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are inherently defective in that they do not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

236.    Defendants were provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

237.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other National Class members have been damaged in an amount to be proven at trial.

**COUNT VIII**
**BREACH OF EXPRESS WARRANTY**
**(6 Del. Code §§ 2-313 and 2A-210)**

238.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

239.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

240.    With respect to leases Defendants are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

241.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

242.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW"). This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

243.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

244.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to

repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

245. The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems. Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

246. As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers or lessees of their "clean" diesel vehicles.

247. Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other National Class members purchased or leased their Class Vehicles equipped with the non-compliant "clean" diesel engine and emission systems.

248. Plaintiffs and the National Class members experienced defects within the warranty period. Despite the existence of warranties, Defendants failed to inform Plaintiffs and National Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

249. Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied. Defendants have not

repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

250.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other National Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

251.    Accordingly, recovery by Plaintiffs and the other National Class members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other National Class members, seek all remedies as allowed by law.

252.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Vehicles. Plaintiffs and the other National Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

253.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other National Class members' remedies would be insufficient to make Plaintiffs and the other National Class members whole.

254.    Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and the other National Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and the other National Class members of the

purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

255.    Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, within a reasonable amount of time after Fiat Chrysler was accused by the EPA and CARB of using a defeat device in the Class Vehicles to evade clean air standards.

256.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the other National Class members have been damaged in an amount to be determined at trial.

**B.    State-Specific Claims**

### COUNT IX
### VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Idaho Code § 48-601, *et seq.*)

257.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

258.    Plaintiff Fasching brings this action on behalf of himself and the Idaho Class.

259.    Defendants are "person[s]" under the Idaho Consumer Protection Act ("Idaho CPA"), Idaho Code § 48-602(1).

260.    Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code § 48-602(2).

261.    Defendants participated in misleading, false, or deceptive acts that violated the Idaho CPA.

262.    In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®" engines in the Class Vehicles The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world

driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

263.     Plaintiff and Idaho Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.  Plaintiff Fasching and Idaho Class members did not and could not unravel Defendants' deception on their own.

264.     Defendants thus violated the Act by, at minimum:  (1) representing that the Class Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.  See Idaho Code § 48-603.

265.     In the course of its business, FCA willfully failed to disclose and actively concealed the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

266.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Idaho CPA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a

reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

267.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, FCA violated federal law and therefore engaged in conduct that violates the Idaho CPA.

268.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. FCA was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. FCA concealed this information as well.

269.    FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Idaho Class.

270.    FCA knew or should have known that its conduct violated the Idaho CPA.

271.    Defendants owed Plaintiff a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

C.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

272.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally

began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be worth.

273.    FCA's fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff and the Idaho Class.

274.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and efficiency of FCA-branded vehicles, the quality of the FCA brand, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles.

275.    Plaintiff and the Idaho Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the Idaho Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff also suffered diminished value of their vehicles, as well as lost or diminished use.

276.    Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Idaho CPA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

277.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

278.    As a direct and proximate result of Defendants' violations of the Idaho CPA, Plaintiffs and the Idaho Class have suffered injury-in-fact and/or actual damage.

279.    Pursuant to Idaho Code § 48-608, Plaintiffs and the Idaho Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each Plaintiff and each Idaho Class member.

280.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

281.    Plaintiff and Idaho Class members also seek punitive damages against Defendants because Defendants' conduct evidences an extreme deviation from reasonable standards.  FCA flagrantly, maliciously, and fraudulently misrepresented the safety and reliability of the Class Vehicles, deceived Class members on life-or-death matters, concealed material facts that only they knew, and repeatedly promised Class members all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Class Vehicles.  FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT X**
**BREACH OF EXPRESS WARRANTY**
**(Idaho Code §§ 28-2-313 and 28-12-210)**

282.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

283.    Plaintiff Fasching brings this Count on behalf himself and the Idaho Class.

284.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§  28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

285.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

286.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

287.    Defendants made numerous representations, descriptions, and promises to

288.    Plaintiff and Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

289.    Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff and Class members and therefore, knew that the emission systems contained defects.

290.    Plaintiff and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and Class members.

291.    Any opportunity to cure the express breach is unnecessary and futile.

292.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Class members suffered significant damages and seek damages in an amount to be determined at trial.

COUNT XI
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Idaho Code §§ 28-2-314 and 28-12-212)**

293.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

294.    Plaintiff Fasching brings this Count on behalf of himself and the Idaho Class.

295.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

296.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

297.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

298.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Idaho Code §§ 28-2-314 and 28-12-212.

299.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

300.    Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiff and Idaho Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

**COUNT XII**
**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW**
**(La. Rev. Stat. § 51:1401, *et seq.*)**

301.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

302.    Plaintiff Radziewicz (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Louisiana Class.

303.    Defendants, Plaintiff, and the Louisiana Class are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

304.    Plaintiff and the Louisiana Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

305.    Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

306.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

307.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

308.    Plaintiff and Louisiana Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology. Plaintiff and Louisiana Class members did not and could not unravel Defendants' deception on their own.

309.    Defendants thus violated the Act by, at minimum marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold, Defendants engaged in deceptive business practices prohibited by the Louisiana CPL.

310.    Fiat Chrysler engaged in misleading, false, unfair or deceptive acts or practices that violated the Louisiana CPL by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the EcoDiesel® diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

311.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels. These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809. By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, FCA violated federal law and therefore engaged in conduct that violates the Louisiana CPL.

312.    Fiat Chrysler knew the true nature of its EcoDiesel® engine system, but concealed all of that information until recently. Fiat Chrysler was also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and

distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

313.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Louisiana Class.

314.    Defendants knew or should have known that its conduct violated the Louisiana CPL.

315.    Defendants owed Plaintiff a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

C.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

316.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished. In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

317.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff and the Louisiana Class.

318.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff, about the true environmental cleanliness and

efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at Fiat Chrysler, and the true value of the Class Vehicles.

319.    Plaintiff and the Louisiana Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Louisiana Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them. Plaintiff also suffered diminished value of their vehicles, as well as lost or diminished use.

320.    Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Louisiana CPL. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

321.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

322.    As a direct and proximate result of Defendants' violations of the Louisiana CPL, Plaintiff and the Louisiana Class have suffered injury-in-fact and/or actual damage.

323.    Pursuant to La. Rev. Stat. § 51:1409, Plaintiff and the Louisiana Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

1

2

**COUNT XIII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/**
**WARRANTY AGAINST REDHIBITORY DEFECTS**
**(La. Civ. Code Art. 2520, 2524)**

3

4

324.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though

fully set forth herein.

5

6

325.     Plaintiff Radziewicz brings this Count on behalf of himself and the Louisiana Class.

7

326.     FCA is and was at all relevant times a merchant with respect to motor vehicles.

8

327.     A warranty that the Class Vehicles were in merchantable condition is implied by law in

9

the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in

10

merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the

11

Class Vehicles are inherently defective in that they do not comply with federal and state emissions

12

standards, rendering certain safety and emissions functions inoperative; and the "clean" diesel engine

13

system was not adequately designed, manufactured, and tested.

14

328.     FCA was provided notice of these issues by the investigations of the EPA and individual

15

16

state regulators, numerous complaints filed against it including the instant complaint, and by numerous

17

individual letters and communications sent by Plaintiff and other Class members before or within a

18

reasonable amount of time after the allegations of Class Vehicle defects became public.

19

20

329.     As a direct and proximate result of Defendants' breach of the warranties of

merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at

21

22

trial.

23

**COUNT XIV**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349)**

24

25

330.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding

26

paragraphs of this Complaint, as if fully set forth herein.

27

331.     Plaintiff McGann brings this Count on behalf of himself and the New York Class.

28

332.    Plaintiff, the Class, and the Defendants are "persons" under N.Y. Gen. Bus. Law. § 349(h).

333.    Plaintiff intends to assert a claim under the N.Y. Gen. Bus. Law § 349 ("Section 349"), which makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

334.    Defendants engaged in unlawful deceptive acts or practices. In their business dealings, Defendants intentionally concealed and suppressed material facts about the quality of the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

335.    Plaintiff and the New York Class members reasonably relied on the Defendants deceptive practices. Plaintiff and the Class members cannot and could not unravel this deceptive scheme on their own because the technology used in making the software is extremely sophisticated.

336.    Defendants violated Section 349 by misrepresenting the characteristics and quality of its vehicles to induce customers to unknowingly purchase or lease vehicles with emission evading features. The Defendants engaged in misleading, false, unfair or deceptive acts by installing the defeat device, concealing its existence, and then marketing the vehicles as legally compliant.

337.    The EPA regulations and the Clean Air Act set the standards for emission compliance. The Defendants' software designed to evade these standards is a violation of federal law. This conduct, which is meant to skirt federal law, constitutes a deceptive practice under Section 349.

338.    Defendants had a duty to disclose the emissions deception they engaged in with respect to the vehicles at issue because knowledge of the deception and its details were known and/or accessible only to Defendants, because Defendants had exclusive knowledge as to implementation and maintenance of their deception, and because Defendants knew the facts were unknown to or not reasonably discoverable by Plaintiff or Class members.

339.    Defendants also had a duty to disclose because they made general affirmative representations about the qualities of their vehicles with respect to emissions standards which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding their emissions deception, the actual emissions of their vehicles, their actual philosophy with respect to compliance with federal and state clean air law and emissions regulations, and their actual practices with respect to the vehicles at issue.

340.    Having volunteered to provide information to Plaintiffs and the Class, Defendants had the duty to disclose the entire truth. These omitted and concealed facts were material because they directly affect the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendants represented to Plaintiff and Class members that they were purchasing compliant, high-performing vehicles, and certification testing appeared to confirm this—except that, secretly, Defendants had thoroughly subverted the testing process.

341.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that their vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and Defendants did so at the expense of Plaintiff and Class members.

342.    On information and belief, Defendants have still not made full and adequate disclosures, particularly as to past conduct, and continue to defraud Plaintiff and Class members by concealing material information regarding both the emissions qualities of their vehicles and their emissions deception.

343.    Defendants' illegal use of the defeat device to evade emission standards was material to the Plaintiff and the New York Class. Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly compliant cars manufactured by Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.

344.    Plaintiff and the New York Class suffered actual damages as a proximate result of Defendants' deceptive conduct. Plaintiff and New York Class members would not have purchased the cars and/or would not have paid full value had the Defendants' deceptive practice been known. Moreover, the value of the vehicles purchased has now diminished because of Defendants' misconduct.

345.    Plaintiff and the New York Class seek all just and proper remedies under the law including, but not limited to, actual damages or $50 dollars, whichever is greater, up to $1,000 in treble damages, and punitive damages to the extent they are applicable. Section 349 allows for reasonable attorney's fees and costs as well as equitable injunctive relief where appropriate.

## COUNT XV
## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. Gen. Bus. Law § 350)

346.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

347.    Plaintiff brings this Count on behalf of himself and the New York Class.

348.    Defendants engaged in "conduct of business, trade or commerce," as defined in N.Y. Gen. Bus. Law § 350 ("Section 350").

349.    Under Section 350 it is unlawful to falsely advertise "in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising is defined under N.Y. Gen. Bus. Law § 350-a (1) in the following way:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.   In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

350.    Defendants caused to be made or disseminated throughout New York and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other Class members

351.    Defendants disseminating advertisements that failed to reveal material facts about the efficiency, safety, reliability, and functionality of the Class Vehicles especially in the light of the affirmative representations made about such vehicles.

352.    Defendants intentionally and knowingly misrepresented the Class Vehicles to the Plaintiff the New York class. The misrepresentations and omissions were likely to deceive a reasonable consumer and did deceive Plaintiff and the New York Class.

353.    The Class Vehicles do not operate as advertised because of the defeat device. As a result, the Class Vehicles are also less valuable than advertised by the Defendants.

354.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of New York and nationwide.

355.    Plaintiff and the New York Class suffered actual damages as a proximate result of Defendants' deceptive conduct. Plaintiff and New York Class members would not have purchased the cars and/or would not have paid full value had the Defendants' deceptive practice been known. Moreover, the value of the vehicles purchased has now diminished because of Defendants' misconduct.

356.    Plaintiff and the New York Class seek all just and proper remedies under the law including, but not limited to, actual damages or $50 dollars, whichever is greater, up to $1,000 in treble damages, and punitive damages to the extent they are applicable. Section 349 allows for reasonable attorney's fees and costs as well as equitable injunctive relief where appropriate.

357.    Plaintiff and the New York Class seek actual damages in an amount to be determined at trial and statutory damages of $500 for each for New York class members. Defendants' conduct was willful entitling the class members to three times actual damages or up to $10,000.

### COUNT XVI
### BREACH OF EXPRESS WARRANTY
#### (N.Y. U.C.C. Law §§ 2-313 and 2A-210)

358.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

359.    Plaintiff McGann brings this Count on behalf of himself and the New York Class members.

360.    Defendants are all, with respect to motor vehicles, "merchants," "sellers," and/or "lessors," within the meaning of N.Y. UCC Law § 2-104(1), § 2-103(1)(d), and § 2A-103(1)(p), respectively.

361.    The vehicles as issue were at all relevant times "goods" within the meaning of N.Y. UCC Law § § 2-105(1) and 2A-103(1)(h).

362.    Defendants made numerous representations, descriptions, and promises to Plaintiff and Class members regarding the performance and emission controls of their vehicles.

363.    The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

364.    Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff and Class members and therefore, knew that the emission systems contained defects.

365.    Plaintiff and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiff and Class members.

366.    Any opportunity to cure the express breach is unnecessary and futile.

367.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Class members suffered significant damages and seek damages in an amount to be determined at trial.

### COUNT XVII
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (N.Y. U.C.C. Law §§ 2-314 and 2A-212)

368.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

369.     Plaintiff brings this Count on behalf of himself and the New York Class members.

370.     Defendants are all, with respect to motor vehicles, "merchants," "sellers," and/or "lessors," within the meaning of N.Y. UCC Law § 2-104(1), § 2-103(1)(d), and § 2A-103(1)(p), respectively.

371.     The vehicles as issue were at all relevant times "goods" within the meaning of N.Y. UCC Law § § 2-105(1) and 2A-103(1)(h).

372.     An implied warranty of fitness means that the vehicles were both in merchantable condition and fit for their ordinary purpose existed at all relevant times under N.Y. UCC Law N.Y. UCC §§ 2-314 and 2A-212.

373.     Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

374.     Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiff and New York Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

## COUNT XVIII
## FRAUDULENT CONCEALMENT
## (BASED ON NEW YORK COMMON LAW)

375.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

376.     Plaintiff brings this Count on behalf of himself and the New York Class members.

377.     Defendants intentionally concealed that the NOx reduction system in the Class Vehicles turns off or is limited during normal driving conditions, that the Class Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of Defendants' advertising campaign, emitted

unlawfully high levels of pollutants such as NOx, and were noncompliant with EPA emission requirements, or Defendant acted with reckless disregard for the truth and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

378.    Defendants further affirmatively misrepresented to Plaintiff and Class members in advertising and other forms of communication, including standard and uniform material provided with each vehicle, that the Class Vehicles being sold had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

379.    Defendants knew these representations were false when made.

380.    The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of Defendants' advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Class Vehicles turns off or is limited during normal driving conditions.

381.    Defendants had a duty to disclose that the NOx reduction system in the Class Vehicles turns off or is limited during normal driving conditions and that the Class Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA-compliant and unreliable, because Plaintiff and the other Class members relied on Defendants' material representations that the Class Vehicles they were purchasing were reduced-emission vehicles, efficient, and free from defects.

382.    As alleged in this Complaint, at all relevant times, Defendants held out the Class Vehicles to be reduced-emissions, EPA-compliant vehicles. Defendant disclosed certain details about the diesel engine, but nonetheless, Defendant intentionally failed to disclose the important facts that the NOx

reduction system in the Class Vehicles turns off or is limited during normal driving conditions, and that the Class Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants than expected by a reasonable consumer, emitted unlawfully high levels of pollutants, and were non-compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

383.    The truth about the defective emissions controls and Defendants' manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to Defendants; Plaintiff and the Class members did not know of these facts, and Defendants actively concealed these facts from Plaintiff and Class members.

384.    Plaintiff and Class members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false and/or misleading. As consumers, Plaintiff and Class members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiff and Class members by concealing the true facts about the Class Vehicles' emissions.

385.    Defendants also concealed and suppressed material facts concerning what is evidently the true culture of Defendants' businesses—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. Defendants also emphasized profits and sales above the trust that Plaintiff and Class members placed in its representations. Consumers buy diesel cars and their component parts from Defendants because they feel they are "clean" diesel cars; they do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Class Vehicles are doing.

386.    Defendants' false representations were material to consumers because they concerned the quality of the Class Vehicles, because they concerned compliance with applicable federal and state laws

and regulations regarding clean air and emissions, and also because the representations played a

significant role in the value of the vehicles. As Defendants well knew, their customers, including

Plaintiff and Class members, highly valued that the vehicles they were purchasing or leasing were fuel

efficient, "ultra-clean" diesel cars with reduced emissions, and they paid accordingly.

387.    Defendants had a duty to disclose the emissions defect, defective design of emissions

controls, and violations with respect to the Class Vehicles because details of the true facts were known

and/or accessible only to Defendants, because Defendants had exclusive knowledge as to such facts, and

because Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or Class

members. Defendants also had a duty to disclose because it made general affirmative representations

about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-

emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive,

and incomplete without the disclosure of the additional facts set forth above regarding the actual

emissions of the vehicles, Defendants' actual philosophy with respect to compliance with federal and

state clean air laws and emissions regulations, and Defendants' actual practices with respect to the

vehicles at issue. Having volunteered to provide information to Plaintiff and Class members, Defendants

had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts

were material because they directly impact the value of the Class Vehicles purchased or leased by

Plaintiff and Class members. Whether a manufacturer's products pollute, comply with federal and state

clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to

such compliance or non-compliance, are material concerns to a consumer, including with respect to the

emissions certifications testing their vehicles must pass. Defendant represented to Plaintiff and Class

members that they were purchasing or leasing reduced-emission diesel vehicles when, in fact, they were

purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

388.    Defendants actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not in fact "ultra-clean" diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendants money, and it did so at the expense of Plaintiff and Class members.

389.    Defendants still have not made full and adequate disclosures, and continue to defraud Plaintiff and Class members by concealing material information regarding the emissions qualities of the Class Vehicles.

390.    Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by Defendants, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Class members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Class members.

391.    Because of the concealment and/or suppression of the facts, Plaintiff and Class members have sustained damage because they own vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions and Defendants' failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of Defendants' vehicles, and the serious issues engendered by Defendants' corporate policies. Had Plaintiff and Class members been aware of the true emissions facts with regard to the Class Vehicles, and Defendants' disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiff and Class members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

392.     The value of Plaintiff's and Class members' vehicles has diminished as a result of Defendants' fraudulent concealment of the defective emissions controls of the Class Vehicles, the unlawfully high emissions of the Class Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished Defendants' brand name, which is attached to Plaintiff's and Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. Accordingly, Defendants are liable to Plaintiff and Class members for damages in an amount to be proven at trial.

393.     Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XIX
## VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (Or. Rev. Stat. §§ 646.605, *et seq.*)

394.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

395.     Plaintiff Fasching brings this action on behalf of himself and the Oregon Class against all Defendants.

396.     Defendants, Plaintiff, and the Oregon Class are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

397.     Defendants are engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

398.     The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unfair or deceptive acts conduct in trade or commerce ...." Or. Rev. Stat. § 646.608(1).

399.    In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®" engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

400.    Plaintiff and Oregon Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.  Plaintiff and Oregon Class members did not and could not unravel Defendants' deception on their own.

401.    Defendants thus violated the provisions of the Oregon UTPA, at a minimum by:  (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

402.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Oregon UTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself

as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

403.    Defendants compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness, and efficiency, and stood behind its vehicles after they were sold.

404.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, FCA violated federal law and therefore engaged in conduct that violates the Oregon UTPA.

405.    Fiat Chrysler knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Fiat Chrysler also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

406.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Oregon Class.

407.    Defendants knew or should have known that its conduct violated the Oregon UTPA.

408.    Defendants owed Plaintiff and Oregon Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.     intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

C.     made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

409.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. The value of the Class Vehicles has therefore plummeted.  In light of the stigma Defendants' misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

410.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiff and the Oregon Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

411.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and Oregon Class members, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles.

412.    Plaintiff and Oregon Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiffs and the Oregon Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had

been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

413.     Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oregon UTPA in the course of its business.

414.     Defendants' violations present a continuing risk to Plaintiff as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

415.     Pursuant to Or. Rev. Stat. § 646.638, Plaintiff and the Oregon Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oregon UTPA.

**COUNT XX**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Or. Rev. Stat. § 72.3140 and 72A.2120)**

416.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

417.     Plaintiff brings this Count on behalf himself and the Oregon Class against Defendants.

418.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

419.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

420.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

421.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

422.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

423.    Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiff and Oregon Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

**COUNT XXI**
**BREACH OF EXPRESS WARRANTY**
**(Or. Rev. Stat. §§ 72.3130 and 72A.2100)**

424.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

425.    Plaintiff Fasching brings this Count on behalf of himself and the Oregon Class against Defendants.

426.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

427.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

428.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

429.    Defendants made numerous representations, descriptions, and promises to Plaintiff and Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to

required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

430.    Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff and Class members and therefore, knew that the emission systems contained defects.

431.    Plaintiff and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and Class members.

432.    Any opportunity to cure the express breach is unnecessary and futile.

433.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff Fasching and Class members suffered significant damages and seek damages in an amount to be determined at trial.

**COUNT XXII**
**VIOLATIONS OF THE SOUTH CAROLINA**
**UNFAIR TRADE PRACTICES ACT**
**(S.C. Code Ann. § 39-5-10, *et seq.*)**

434.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

435.    Plaintiff Muckenfuss brings this action on behalf of himself and the South Carolina Class against all Defendants.

436.    Defendants, Plaintiff, and the members of the South Carolina Class are "persons" within the meaning of S.C. Code § 39-5-10(a).

437.    Defendants are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

438.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

439.    In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®" engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

440.    Plaintiff and South Carolina Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.  Plaintiff and South Carolina Class members did not and could not unravel Defendants' deception on their own.

441.    Defendants thus violated the provisions of the South Carolina UTPA, at a minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) failing

to disclose information concerning the Class Vehicles with the intent to induce consumers to purchase or lease the Class Vehicles.

442.    Fiat Chrysler engaged in misleading, false, unfair or deceptive acts or practices that violated the South Carolina UTPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

443.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, FCA violated federal law and therefore engaged in conduct that violates the South Carolina UTPA.

444.    Fiat Chrysler knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Fiat Chrysler also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

445.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the South Carolina Class.

446.    Defendants knew or should have known that their conduct violated the South Carolina UTPA

447.    Defendants owed Plaintiff and South Carolina Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiffs, Class members; and/or

C.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

448.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Defendants' misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

449.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the South Carolina Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

450.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs and South Carolina Class members, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the FCA brand, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles.

451.    Plaintiff and South Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the South Carolina Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff and South Carolina Class members also suffered diminished value of their vehicles, as well as lost or diminished use.

452.    Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the South Carolina UTPA in the course of its business.

453.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

454.    Pursuant to S.C. Code § 39-5-140(a), Plaintiff and the South Carolina Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing violations, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the South Carolina UTPA.

**COUNT XXIII**
**VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT**
**(S.C. Code Ann. § 56-15-10, *et seq.*)**

455.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

456.    Plaintiff Muckenfuss brings this claim on behalf of himself and the South Carolina Class.

457.    Defendants were "manufacturer[s]" as set forth in S.C. Code Ann. § 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

1    458.    Defendants committed unfair or deceptive acts or practices that violated the South

2  Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann.

3  § 56-15-30.

4    459.    Defendants engaged in actions which were arbitrary, in bad faith, unconscionable, and

5  which caused damage to Plaintiff, the South Carolina Class, and to the public.

6

7    460.    Defendants' bad faith and unconscionable actions include, but are not limited to:  (1)

8  representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not

9  have, (2) representing that Class Vehicles are of a particular standard, quality, and grade when they are

10  not, (3) advertising Class Vehicles with the intent not to sell them as advertised, (4) representing that a

11  transaction involving Class Vehicles confers or involves rights, remedies, and obligations which it does

12  not, and (5) representing that the subject of a transaction involving Class Vehicles has been supplied in

13  accordance with a previous representation when it has not.

14

15    461.    Defendants resorted to and used false and misleading advertisements in connection with

16  its business.  As alleged above, Defendants made numerous material statements about the safety,

17  cleanliness, efficiency, and reliability of the Class Vehicles that were either false or misleading.  Each of

18  these statements contributed to the deceptive context of Defendants' unlawful advertising and

19  representations as a whole.

20

21    462.    Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiff brings this action on behalf of

22  himself and the South Carolina Class, as the action is one of common or general interest to many

23  persons and the parties are too numerous to bring them all before the court.

24    463.    Plaintiff and the South Carolina Class are entitled to double their actual damages, the cost

25  of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110.  Plaintiff also seeks injunctive relief

26  under S.C. Code Ann. § 56-15-110.  Plaintiff also seeks treble damages because Defendants acted

27  maliciously.

28

**COUNT XXIV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(S.C. Code §§ 36-2-314 and 36-2A-212)**

464.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

465.    Plaintiff Muckenfuss brings this Count on behalf of himself and the South Carolina Class against Defendants.

466.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

467.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

468.    The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

469.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

470.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

471.    Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiff and South Carolina Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

## COUNT XXV
## BREACH OF EXPRESS WARRANTY
### (S.C. Code §§ 36-2-313 and 36-2A-210)

472.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

473.     Plaintiff Muckenfuss brings this action on behalf of himself and the South Carolina Class against all Defendants.

474.     Defendants are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

475.     With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

476.     The Class Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

477.     Defendants made numerous representations, descriptions, and promises to Plaintiff and Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

478.     Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff and Class members and therefore, knew that the emission systems contained defects.

479.    Plaintiff and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and Class members.

480.    Any opportunity to cure the express breach is unnecessary and futile.

481.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Class members suffered significant damages and seek damages in an amount to be determined at trial.

## COUNT XXVI
### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
#### (Cal. Civ. Code § 1750, *et seq.*)

482.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

483.    Plaintiffs Sing and Tran bring this action on behalf of themselves and the California Class against all Defendants.

484.    Defendants are "person[s]" under Cal. Civ. Code § 1761(c).

485.    Plaintiffs and the California Class are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Class Vehicles.

486.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).  Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below by, at a minimum, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade

when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

487.     In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®" engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

488.     Plaintiff and California Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.  Plaintiff and California Class members did not and could not unravel Defendants' deception on their own.

489.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the CLRA by installing, failing to disclose and actively concealing the illegal defeat device and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

490.     The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare.

"Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations. *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, Defendants violated federal law and therefore engaged in conduct that violates the CLRA

491.    Defendants knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Defendants were also aware that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations. Defendants concealed this information as well.

492.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the California Class.

493.    Defendants knew or should have known that its conduct violated the CLRA.

494.    Defendants owed Plaintiffs a duty to disclose the illegality and public health and safety risks of the Class Vehicles because they:

A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

B.    intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

C.    made incomplete representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

495.    Defendants concealed the illegal defeat device and the true emissions, efficiency, and performance of the "clean" diesel system, resulting in a raft of negative publicity once the defects finally began to be disclosed. The value of the Class Vehicles has therefore greatly diminished.  In light of the stigma attached to those vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be worth.

496.    Defendants' fraudulent use of the "defeat device" and its concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the California Class. A vehicle made by a reputable manufacturer of safe vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

497.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles

498.    Plaintiff and the California Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the California Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiff and the California Class members also suffered diminished value of their vehicles, as well as lost or diminished use.

499.    Defendants had an ongoing duty to all of their customers to refrain from unfair and deceptive practices under the CLRA.  All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

500.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

501.    As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and the California Class have suffered injury-in-fact and/or actual damage.

502.    Under Cal. Civ. Code § 1780(a), Plaintiff and the California Class seek monetary relief against Defendants measured as the diminution of the value of their vehicles caused by Defendants' violations of the CLRA as alleged herein.

503.    Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against Defendants of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.   Defendants knew or should have known that their conduct was directed to one or more California Class members who are senior citizens or disabled persons.   Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more California Class members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

504.    Plaintiffs also seek punitive damages against Defendants because they carried out reprehensible conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the California Class to potential cruel and unjust hardship as a result.   Defendants intentionally and willfully deceived Plaintiff on life-or-death matters, and concealed material facts that only Defendants knew.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

505.    Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

506.    Certain Plaintiffs have sent a letter complying with Cal. Civ. Code § 1780(b).

**COUNT XXVII**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

507.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

508.    Plaintiffs Singh and Tran bring this claim on behalf of themselves and the California Class.

509.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."   Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

510.    Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants' conduct violates the UCL in at least the following ways:

A.    by knowingly and intentionally concealing from Plaintiff and the other California Class members that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs and Class members;

B.    by marketing Class Vehicles as possessing functional and defect-free, EPA-compliant "clean" diesel engine systems;

C.    by purposefully installing an illegal "defeat device" in the Class Vehicles to fraudulently obtain EPA certification and cause Class Vehicles to pass emissions tests when in truth and fact they did not pass such tests;

D.    by violating federal laws, including the Clean Air Act; and

E.    by violating other California laws, including California laws governing vehicle emissions and emission testing requirements.

511.    Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and the other California Class members to make their purchases or leases of their Class Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not

contain "ultra-clean" EcoDiesel® diesel engine systems that failed to comply with EPA and California emissions standards.

512.     Accordingly, Plaintiffs and the other California Class members have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

513.     Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants under Cal. Bus. & Prof. Code § 17200.

514.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

**COUNT XXVIII**
**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**

515.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

516.     Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

517.     California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

518.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and the other Class members.

519.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

520.    Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of Defendants with respect to the safety, performance, and reliability of the Class Vehicles.  However, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®" engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

521.    Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

522.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

523.    Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT XXIX**
**BREACH OF EXPRESS WARRANTY**
**(Cal. Com. Code §§ 2313 and 10210)**

524.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

525.    Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

526.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

527.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

528.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

529.    Defendants made numerous representations, descriptions, and promises to Plaintiffs and California Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to

required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

530.    Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiffs and Class members and therefore, knew that the emission systems contained defects.

531.    Plaintiffs and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiffs and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs and Class members.

532.    Any opportunity to cure the express breach is unnecessary and futile.

533.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs Singh and Tran, and Class members, suffered significant damages and seek damages in an amount to be determined at trial.

### COUNT XXX
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Cal. Com. Code §§ 2314 and 10212)

534.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

535.    Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

536.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

537.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

538.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

539.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

540.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

541.    Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiffs and California Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

## COUNT XXXI
## VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
### (Cal. Civ. Code §§ 1791.2 & 1793.2(d))

542.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

543.    Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

544.    Plaintiff and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

545.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

546.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

547.    Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by Defendants.

548.    Defendants made express warranties to Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

549.    In connection with the purchase or lease of each one of its new vehicles, Defendants provide an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

550.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

551.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Defendants also provide an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

552.    The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emission systems.  Thus, Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function

improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

553.   As manufacturers of light-duty vehicles, Defendants were required to provide these warranties to purchasers of their "clean" diesel vehicles.

554.   Defendants' warranties formed the basis of the bargain that was reached when Plaintiffs and Class members purchased or leased their Class Vehicles equipped with the non-EPA complaint "clean" diesel engine system from FCA.

555.   Plaintiffs and Class members experienced defects within the warranty period.  Despite the existence of warranties, Defendants failed to inform Plaintiff and Class members that the Class Vehicles were intentionally designed and manufactured to be out of compliance with applicable state and federal emissions laws, and failed to fix the defective emission components free of charge.

556.   Plaintiffs and Class members gave Defendants or their authorized repair facilities opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because Defendants or their authorized repair facility refused to attempt the repair.  The Defendants did not promptly replace or buy back the Class Vehicles of Plaintiff and the other Class members.

557.   As a result of Defendants' breach of its express warranties, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiff and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of Defendants' products, the products' malfunctioning, and the nonuse of their Class Vehicles.

558.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

559.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

### COUNT XXXII
### VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Cal. Civ. Code §§ 1791.1 and 1792)

560.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

561.    Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

562.    Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

563.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

564.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

565.    Defendants impliedly warranted to Plaintiffs and the other Class members that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

566.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

567.    The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' "clean" diesel engine system.  Specifically, the Class Vehicles do not comply with federal and state emissions standards, as software on these vehicles was designed to cheat emission testing by showing lower emissions during testing conditions then actually existed when the vehicle operated on the road. In addition, the "clean" diesel engine system was not adequately designed, manufactures, and tested.

568.    Because of the defects in the Class Vehicles' EcoDiesel® engine systems, they are not in merchantable condition and thus not fit for ordinary purposes.

569.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' diesel engine system.

570.    Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles containing defects associated with the diesel engine system.  Furthermore, these defects have caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused Class Vehicles to depreciate in value.

571.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose defective condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of Defendants' products, the products' malfunctioning, and the nonuse of their Class Vehicles.

572.    Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

573.    Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## COUNT XXXIII
## BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES
### (Cal. Civ. Code §§ 1793.2, *et seq.*)

574.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

575.    Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

576.    Each class vehicle is covered by express California Emissions Warranties as a matter of law.  *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

577.    The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board."  *Id.*  This provision applies without any time or mileage limitation.  *See id.*

578.    The California Emissions Warranties also specifically warrant Class members against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first.  *See id.*

579.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty."  Cal. Civ. Code § 1793.2.

580.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option.  *See* Cal. Civ. Code § 1793.2(d)(2).

581.    Class members are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Defendants are refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

582.    This complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods." *Id.*

583.    In addition to all other damages and remedies, Class members are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1). Any "third-party dispute resolution process" offered by Defendants does not relieve Defendants from the civil penalty imposed because Defendants are not offering the process to Class members for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant. *See* Cal. Civ. Code § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

## COUNT XXXIV
## FAILURE TO RECALL/RETROFIT

584.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

585.    Plaintiffs Singh and Tran bring this Count on behalf of themselves and the California Class.

586.    Defendants manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Class Vehicles, as set forth above.

587.    Defendants knew or reasonably should have known that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable.

588.    Defendants became aware that the Class Vehicles were dangerous when used in a reasonably foreseeable manner, and posed an unreasonable after the Vehicles were sold.

589.    Defendants failed to recall the Class Vehicles in a timely manner or warn of the dangers posed by Class Vehicles.

590.    A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Vehicles.

591.    Plaintiffs and Class members were harmed by Defendants' failure to recall the Class Vehicles properly and in a timely manner and, as a result, have suffered damages, including their out-of-pocket costs, losses, and inconvenience expended in complying with the false recall, and caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the Class Vehicles.

592.    Defendants' failure to timely recall the Class Vehicles was a substantial factor in causing the harm to Plaintiff and Class members as alleged herein.

**COUNT XXXV**
**VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT**
**(W. Va. Code § 46A-1-101, *et seq.*)**

593.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

594.    Plaintiff Neupert brings this action on behalf of himself and the West Virginia Class.

595.    Defendants, Plaintiffs, and the West Virginia Class are "persons" within the meaning of W. Va. Code § 46A-1-102(31).  Plaintiffs and the West Virginia Class members are "consumers" within the meaning of W. Va. Code §§ 46A-1-102(2) and 46A-1-102(12).

596.    Defendants are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

597.    The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  W. Va. Code § 46A-6-104.

598.    In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the true emissions produced by the misnamed "EcoDiesel®"

engines in the Class Vehicles. The Defendants installed software in their vehicles that enabled emissions controls for nitrogen oxide—a pollutant that contributes to health problems and global warming—to pass EPA emissions testing while at the same time disabling the same controls during real-world driving. Specifically, the software was designed to cheat emission testing by showing lower emissions during laboratory testing conditions then actually existed when the vehicle operated on the road. This deceptive practice enabled Defendants' vehicles to pass emission certification tests through deliberately induced lower-than-real-world emissions readings.

599.    Plaintiff and West Virginia Class members had no way of discerning that Defendants' representations were false and misleading because Defendants' defeat device software was extremely sophisticated technology.  Plaintiff and West Virginia Class members did not and could not unravel Defendants' deception on their own.

600.    Defendants thus violated the West Virginia CCPA, at a minimum by: representing that the Class Vehicles had characteristics, uses, benefits and qualities which they do not have; representing that the Class Vehicles are of a particular standard, quality and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and engaging in other conduct creating a likelihood of confusion or of misunderstanding.  See W.Va. Code § 46A-6-102(7)(E), (G), (I) and (L).

601.    Fiat Chrysler engaged in misleading, false, unfair or deceptive acts or practices that violated the West Virginia CCPA by installing, failing to disclose and/or actively concealing the "defeat device" and the true cleanliness and performance of the "clean" diesel engine system, by marketing its vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind its vehicles after they were sold.

602.    The Clean Air Act and EPA regulations require that automobiles limit their emissions output to specified levels.  These laws are intended for the protection of public health and welfare. "Defeat devices" like those in the Class Vehicles are defined and prohibited by the Clean Air Act and its regulations.  *See* 42 U.S.C. § 7522(a)(3)(B); 40 CFR § 86.1809.  By installing illegal "defeat devices" in the Class Vehicles and by making those vehicles available for purchase, FCA violated federal law and therefore engaged in conduct that violates the West Virginia CCPA.

603.    Fiat Chrysler knew it had installed the "defeat device" in the Class Vehicles, and knew the true nature of its "clean" diesel engine system, but concealed all of that information until recently. Fiat Chrysler also knew that it valued profits over environmental cleanliness, efficiency, and compliance with the law, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations, but it concealed this information as well.

604.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the West Virginia Class.

605.    Defendants knew or should have known that their conduct violated the West Virginia CCPA.

606.    Defendants owed Plaintiff and West Virginia Class members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Class Vehicles because they:

    A.    possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

    B.    intentionally concealed the foregoing from regulators, Plaintiff, Class members; and/or

    C.    Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Class Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

607.    Defendants concealed the illegal defeat device and the true emissions, efficiency and performance of the Class Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed.  The value of the Class Vehicles has therefore plummeted.  In light of the stigma Defendants' misconduct attached to the Class Vehicles, the Class Vehicles are now worth less than they otherwise would be worth.

608.    Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs and the West Virginia Class.  A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

609.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and West Virginia Class members, about the true environmental cleanliness and efficiency of Jeep- and Ram-branded vehicles, the quality of the Jeep and Ram brands, the devaluing of environmental cleanliness and integrity at FCA, and the true value of the Class Vehicles.

610.    Plaintiff and West Virginia Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.  Plaintiff and the West Virginia Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

611.    Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of its business.

612.    Defendants' violations present a continuing risk to Plaintiff as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

613.    Pursuant to W. Va. Code § 46A-6-106(a), Plaintiff and the West Virginia Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the West Virginia CCPA.

614.    On January 17, 2017, at least one Plaintiff sent a letter complying with W. VA. CODE § 46A-6-106(c).  Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the West Virginia Class are entitled.

### COUNT XXXVI
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (W. Va. Code §§ 46-2-314 and 46-2A-212)

615.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

616.    Plaintiff Neupert brings this Count on behalf of himself and the West Virginia Class.

617.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code § 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

618.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

619.    The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

620.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-314 and 46-2A-212.

621.    Defendants sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The vehicles were not in

merchantable condition because their defective design violated state and federal laws. The vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

622.    Defendants' breach of the implied warranty of merchantability caused damage to the Plaintiff and West Virginia Class members who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

**COUNT XXXVII**
**BREACH OF EXPRESS WARRANTY**
**(W. Va. Code §§ 46-2-313 and 46-2A-210)**

623.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

624.    Plaintiff Neupert brings this Count on behalf of himself and the West Virginia Class.

625.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

626.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

627.    The Class Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

628.    Defendants made numerous representations, descriptions, and promises to

629.    Plaintiff and Class members regarding the performance and emission controls of their vehicles. The Clean Air Act requires Defendants to provide two types of warranties for light-duty vehicles—a "Performance Warranty" and a "Design and Defect Warranty." Defendants provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. The Design and Defect Warranties required by the EPA covers repairs to the emission system and related

parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

630.     Defendants, however, knew or should have known that their warranties were false and/or misleading. Defendants were aware that they had installed defeat devices in the vehicles they sold to Plaintiff and West Virginia Class members and therefore, knew that the emission systems contained defects.

631.     Plaintiff and Class members reasonably relied on Defendants' representations and express warranties concerning emissions when purchasing or leasing vehicles. The vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff and Class members, those vehicles included devices that caused them to pollute at higher than allowable levels. Those devices are defects. Accordingly, Defendants breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff and Class members.

632.     Any opportunity to cure the express breach is unnecessary and futile.

633.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Class members suffered significant damages and seek damages in an amount to be determined at trial.

**COUNT XXXVIII**
**BREACH OF NEW MOTOR VEHICLE WARRANTY**
**(WEST VIRGINIA "LEMON LAW")**
**(W. Va. Code §§ 46A-6A-1, et seq.)**

634.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

635.     Plaintiff Neupert brings this Count on behalf of himself and the West Virginia Class against Defendants.

636.     The West Virginia Class members who purchased or leased the Class Vehicles in West Virginia are "consumers" within the meaning of W. Va. Code § 46A-6A-2(1).

637.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning of W. Va. Code § 46A-6A-2(2).

638.    The Class Vehicles are "motor vehicles" as defined by W. Va. Code § 46A-6A-2(4).

639.    In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty (NVLW) for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

640.    The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

641.    The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emissions systems. Thus, FCA also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty. The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic emissions control unit (ECU), and the onboard emissions diagnostic device or computer.

642.    The EPA requires vehicle manufacturers to issue Defect Warranties with respect to their vehicles' emissions systems. Thus, FCA also provides an express warranty to its vehicles through a Federal Emissions Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emissions control components, for eight years or 80,000 miles, whichever comes first.

643.    As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to Plaintiffs and the West Virginia Class members.  Defendants' warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the non-compliant EcoDiesel® engine system.

644.    The emissions defect in the Class Vehicles existed from the date of the original sale of the new vehicle to the consumer but could not be detected by a reasonable consumer exercising reasonable care and diligence.  Therefore, applicable express warranties for the Class Vehicles containing the defeat device software would be extended.

645.    On January 17, 2017, at least one West Virginia Plaintiff sent a letter to FCA to provide opportunity to cure pursuant to W.Va. Code §§ 46A-6A-3(a) and 5(c).  FCA failed to offer to cure within the requisite statutory time period.  Plaintiffs and West Virginia Class members therefore seek all damages and relief available against Defendants under the West Virginia Lemon Law.

646.    As a direct and proximate result of Defendants' breaches of their duties under West Virginia's Lemon Law, the West Virginia Class members received goods whose defect substantially impairs their value. The West Virginia Class has been damaged by the diminished market value of the vehicles along with the compromised functioning and/or non-use of their Class Vehicles.

647.    Defendants have a duty under § 46A-6A-3 to make all repairs necessary to correct the defect herein described to bring the Class Vehicles into conformity with all written warranties. In the event that Defendants cannot affect such repairs, they have a duty to replace each Class Vehicle with a comparable new motor vehicle that conforms to the warranty.

648.    As a result of Defendants' breaches, the Plaintiff and the West Virginia Class are entitled to the following:

    A.    Revocation of acceptance and refund of the purchase price, including, but not limited to, sales tax, license and registration fees, and other reasonable expenses incurred for the purchase of the new motor vehicle, or if there be no such revocation of acceptance, damages for diminished value of the motor vehicle;

B.  Damages for the cost of repairs reasonably required to conform the motor vehicle to the express warranty;

C.  Damages for the loss of use, annoyance or inconvenience resulting from the nonconformity, including, but not limited to, reasonable expenses incurred for replacement transportation during any period when the vehicle is out of service by reason of the nonconformity or by reason of repair; and

D.  Reasonable attorney fees.

W. Va. Code § 46A-6A-4(b)(1)-(4).

## XI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and all Classes, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.  Certification of the proposed Nationwide Class and/or Subclasses under Federal Rule of Civil Procedure 23, including appointment of Plaintiffs' counsel as Class Counsel;

B.  An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.  Injunctive relief in the form of a recall or free replacement;

D.  A declaration that the defeat device software in the Class Vehicles is illegal and that the Class Vehicles are defective;

E.  Public injunctive relief necessary to protect public health and welfare, and to remediate the environmental harm caused by the Class Vehicles' unlawful emissions;

F.  Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

G.  Rescission of all Class Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Class Vehicles, including taxes, licenses, and other fees;

H.  Damages under the Magnuson-Moss Warranty Act;

I.  For treble and/or punitive damages as permitted by applicable laws;

J.    An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

K.    An award of costs and attorneys' fees; and

L.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

DATED this 17th day of January, 2017.

KELLER ROHRBACK L.L.P.


By */s/ Jeffrey Lewis*
        Jeffrey Lewis (SBN 66587)
        Lisa Faye Petak (SBN 300914)
        KELLER ROHRBACK L.L.P.
        300 Lakeside Drive, Suite 1000
        Oakland, CA 94612
        (510) 463-3900, Fax (510) 463-3901
        jlewis@kellerrohrback.com
        lpetak@kellerrohrback.com

        Lynn Lincoln Sarko, *pro hac vice forthcoming*
        Derek W. Loeser, *pro hac vice forthcoming*
        Gretchen Freeman Cappio, *pro hac vice forthcoming*
        Dean Kawamoto (SBN 232032)
        Ryan McDevitt, *pro hac vice forthcoming*
        KELLER ROHRBACK L.L.P.
        1201 Third Avenue, Suite 3200
        Seattle, WA 98101
        (206) 623-1900, Fax (206) 623-3384
        lsarko@kellerrohrback.com
        dloeser@kellerrohrback.com
        gcappio@kellerrohrback.com
        dkawamoto@kellerrohrback.com
        rmcdevitt@kellerrohrback.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lesley E. Weaver (SBN 191305)
Robyn R. English, *pro hac vice forthcoming*
BLEICHMAR FONTI & AULD, LLP
1999 Harrison Street, Suite 670
Oakland, CA 94612
(415) 445-4003, Fax: (415) 445-4020
lweaver@bfalaw.com
renglish@bfalaw.com

Benjamin L. Bailey, *pro hac vice forthcoming*
BAILEY GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555, Fax (304) 342-1110
Bbailey@baileyglasser.com

J. Gerard Stranch IV, *pro hac vice forthcoming*
Joe P. Leniski, Jr., *pro hac vice forthcoming*
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801, Fax (615) 250-3937
gerards@bsjfirm.com
joeyl@bsjfirm.com

Joseph F. Rice, *pro hac vice forthcoming*
Ann Ritter, *pro hac vice forthcoming*
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000, Fax (843) 216-9450
jrice@motleyrice.com
aritter@motleyrice.com

Elizabeth Cabraser (SBN 083151)
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000, Fax(415) 956-1008
ecabraser@lchb.com

David S. Stellings, *pro hac vice forthcoming*
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500, Fax (212) 355-9592
dstellings@lchb.com